CALLAHAN v. CALLAHAN.

1. STATUTES—MARRIAGE AND ISSUE OF SLAVES.—Enabling acts passed after emancipation in 1865, legalizing slave marriages and legitimating children of slave mothers and also of slave fathers when recognized, were not in violation of the provisions of the Constitution of the United States and of this State, as to bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts.

2. IBID.—IBID.—DOUBLE MARRIAGES.—These acts were intended to be retroactive and to affect marriages previously solemnized and children previously born. Nevertheless they were valid, and under their operation the recognized children of a prior moral marriage between a free person of color and a slave woman, were declared to be the legitimate children of their father, notwithstanding his legal second marriage before 1865 to a free woman of color, and the birth of issue thereto, while his first wife survived and continued to live on the same place.

3. MARRIAGE—VESTED RIGHTS—SLAVE MARRIAGES.—Whatever else marriage may be in law, it is a civil contract and confers vested rights, but all vested rights are not beyond legislative interference. In this matter, however, the legislature did not intend to interfere with valid legal marriages already contracted between free persons of color, and therefore the statute did not legalize a marriage of a free negro man with a slave, where he had afterwards legally married a free woman of color at a time when his former marriage was regarded in law as mere concubinage.

4. IBID.—SLAVE CHILDREN.—The result in this case is that at the death of the husband both wives surviving, the second wife and the children of both wives are the legal heirs of the deceased.

5. PARTITION—POSTPONEMENT BY TESTATOR.—Where a testator directs that his estate stand just as it is until his youngest child attains the age of twenty-one, a complaint for partition before that time is premature, and should be dismissed.

Before NORTON, J., Abbeville, October, 1890.

This was an action by Louisa Callahan and her children and the children of a deceased child against Martha Bugg Callahan as executrix, and in her own right, and against her children, for partition of the estate of Green Callahan, and for other relief. The master's report (omitting the statement of facts restated in the opinion) was as follows:

Both plaintiffs' and defendants' counsel seemed to take it for granted in the argument before me that the expression, "my first children," used in the will, refers to his children by Louisa, while it appears from the testimony that he was accustomed to refer to the sons of Louisa as "my boys." These children all appear to have been born prior to the passage of the act of 1865, and I think it clear that they were so recognized and acknowledged by their father as to make them his legitimate children under the 4th section of that act. 13 Stat., 291.

But the main question involved in the case is the relation of
Louisa to Green. If she was his wife, then his marriage with
Martha was a nullity, and the issue of such marriage are illegiti-
mate. The marriage ceremony of Green and Louisa was sol-
emnized by a person who had no authority to perform such cere-
monies under the law of the Methodist church, for he was, by
the testimony, but a class leader and exhorter of that church,
and such persons never had authority from their church to per-
form the marriage ceremony. Still, I do not think this would
invalidate the marriage, for our law requires no particular cere-
mony nor formality to make a marriage, but only the agreement
of the parties "with an intention that the agreement shall *per se*
constitute the marriage." This marriage was evidently with the
consent of Mr. Ferguson, the owner of Louisa; it was consum-
mated with cohabitation and the birth of children, and the gen-
eral repute, as well as the recognition of the parties, was that
they were husband and wife. So that the ceremony by the man-
ner of its celebration cannot affect the question.

By every moral right Green and Louisa were husband and
wife, and, viewed in the light of morals, the marriage ought to
be sustained. But, unfortunately, this cannot be done under the
law. By the act of 1740 (7 Stat., 397) it was declared that all
negroes, * * * mulatoes, or mestizoes who now are, or shall
hereafter be, in this province, and all their issue and offspring,
born, or to be born, shall be, and they are hereby declared to be,
and remain forever hereafter, absolute slaves; * * * and shall
be deemed, held, taken, reputed, and adjudged in law to be chat-
tels personal, in the hands of their owners, * * * to all intents,
constructions, and purposes whatsoever," free negroes, mulattoes,
etc., being excepted. And by section 53 of the same act it was
enacted that "this act, and all clauses therein contained, shall be
construed most largely and beneficially for the promoting and
carrying into execution this act," etc. This statute was re-en-
acted in 1743 and in 1751, and having expired by limitation. it
was revived and re-enacted without limitation in 1783, after
South Carolina had become a sovereign State. 4 Stat., 540.

Accordingly a line of decisions of the Appellate Courts of this
State, extending from 1 Bay (1792) to 14 Richardson's Equity

(1868), have uniformly treated the slave as a mere chattel personal, "generally speaking, not considered as persons, but as things." Says Chancellor DeSaussure in *Bynum* v. *Bostick*, 4 DeSaus., 266: The status of the slave is thus defined by Judge Wardlaw: He was "subject to the absolute control of a master, whenever the latter is not restrained by law, having no power to contract; * * * under all disability which has not been removed," etc. *Blakely* v. *Tisdale*, 14 Rich. Eq., 100. "A slave cannot contract and be contracted with," says Judge O'Neall in his "Negro Law of South Carolina," sec. 36. Citing *Gregg* v. *Thompson*, 2.Mill, 331 ; and, again, sec. 37 : "A slave cannot even legally contract marriage. The marriage of such a one is morally good, but in point of law the union of slave and slave, or slave and free negro, is concubinage merely." And in section 38 he continues: "The consequence is that the issue of a marriage between a slave and a free negro are illegitimate, and cannot inherit from father or mother, who may be free," and he recommends legislation to remedy the hardship of such a case. The act of 1865 does meet the case.

The marriage of Green and Louisa in 1843 was that of a free negro man with a slave woman, in law a mere nullity. The man could disregard it, repudiate it whenever he chose. No rights accrued from it to either party. The children were illegitimate and could not inherit the property of their father, and if they could, or if he had given it to them, it would have immediately passed to their owner. There would be great excuse found for a man, even under the moral law, to abandon such a connection and seek one which should give to him and his wife and their children the rights incident to the condition of freedom. His previous connection with Louisa was no impediment then to his contracting marriage, and his marriage with Martha, a free woman, was·valid. and their children legitimate.

Counsel for plaintiff argued ingeniously and forcibly from the case of *Davenport* v. *Caldwell*, 10 S. C., 317, that the act of 1865, and the subsequent legislation in 1866 and 1872, are retroactive, and that as the marriage of Joe and Nancy, who lived and died in slavery, was held in that case to be validated by the retrospective power of the legislature in the act of 1865,

so in the present case the marriage of 1843 between Green and Louisa has been validated by the same power. The act of 1872 (15 Stat., 183, Gen. Stats., §§ 2030, 2031) applies to that class of persons "who, previous to their actual emancipation," &c. Green Callahan was a free negro, never emancipated, so far as the testimony shows, and at all events, not since his marriage with Louisa, and the act of 1872 cannot apply to him. The act of 1866 (13 Stat., 393) declares that former slaves and free persons of color "*shall* have the right to make and enforce contracts." It does not seem to be retroactive, and has not been held to be so, as far as I have been able to ascertain. It does not seek to validate any past contract, and only refers to the specific subject of marriage to reiterate the previous legislation declaring the marriage of a white person and a negro void, which reiteration seemed necessary in view of the sweeping bestowal of rights, powers, and privileges on the colored race which that short act makes. If the act of 1865 should be given such retroactive effect in this case, it would result in nullifying the marriage of Green and Martha, which was a contract entered into by two persons having full power, as the law then stood, to make it a valid contract. The Constitution of the United States, art. I., sec. 10, forbids such legislation. The relation of husband and wife, in law, subsisted between Green and Martha, not by the act of 1865, but by their mutual agreement, entered into and consummated in 1861, and vested rights sprung therefrom, which could not be taken away by the subsequent legislation.

I do not think that Louisa can claim any rights from her connection with Green. Her children begotten by Green are legitimated by the act of 1865, sec. 4 : "Every colored child heretofore born is declared to be the legitimate child of his mother, and also of his colored father, if he is acknowledged by such father." As stated before, I think the evidence shows that Green acknowledged these children. The act of 1865 has been repealed (Gen. Stats., 1872, p. 842), but subject to the provision on p. 766, sec. 4, which declares that such repeal shall not affect any act done or right accruing, accrued, or established, * * * before the repeal takes effect." The legitimation of these children of Green and Louisa is a vested right established by that

act, and from such legitimation accrued other rights to these children which cannot be taken away. *Davenport* v. *Caldwell*, 10 S. C., 346  My conclusion is that not Louisa, but Martha, is the lawful wife of Green Callahan, and that all the children born to him by both Louisa and Martha are his legitimate children, and entitled to inherit from him, the children of his deceased children having equally the right of inheritance.

The complaint seeks a partition of the estate. This is premature. The will directs that the estate stands "just as it is until my youngest child comes twenty-one years old." Such time does not yet appear to have arrived. When that period does arrive the estate will probably be subject to partition, and the children of Louisa will be entitled to share equally with those of Martha. No steps have been taken before me to have the accounting prayed for, if, indeed, such accounting would be proper at this stage of the administration and in this proceeding.

I find as matters of fact: 1. That Green Callahan married Louisa Ferguson in 1843. 2. That at that time Green was a free negro and Louisa a slave. 3. That there were born of this marriage the children set forth in the complaint. 4. That Green acknowledged said children to be his. 5. That Green Callahan and Martha Bugg were married in 1861. 6. That at that time both Green and Martha were free persons of color. 7. That there were born of this marriage the children set forth in the complaint, and one other, Thomas.

As conclusions of law : 1. That the marriage of Green and Louisa was void. 2. That the children of this marriage are the legitimate children of Green Callahan and also of Louisa, and are entitled to inherit from either of them, or both. 3. That the marriage of Green and Martha was valid. 4. That the complaint should be dismissed.

The case came on to be heard in the Circuit Court on exceptions to this report. Omitting its statement of facts, the Circuit decree was as follows :

The acts of 1865, 1866, and 1872 are claimed by plaintiffs to legitimize the marriage of Green with Louisa, and, consequently, to annul that with Martha. These acts are retroactive, but are not

of application to all marriages of slaves, only of those who were living together in 1865 or in 1872 as husband and wife. Green and Louisa were not so living at either of those dates, and their marriage is not legalized. The exception laid down by the Supreme Court is where one or both of the parties were then dead. The case in hand illustrates the wisdom of the limitation; without it the marriage of Green to Martha would have been made illegal, Green made a bigamist, Martha a concubine, and the offspring, of a marriage lawful at its consummation, bastards. With the limitation Louisa loses no legal rights—her moral rights are recognized from concubinage—she is made maritally dead, and her children legitimized. Agreeing with the master that the action is prematurely brought in behalf of such, if any, of the children of Louisa, as were recognized by Green as his, it is unnecessary to decide whether he so recognized them, or any of them, and if any, which. And I need not determine whether there is any property undisposed of by Green's will.

The cases bearing upon the aforesaid acts are : (I.) *Clement* v. *Riley*, 33 S. C., 66, decides only (1) that the children of a colored female slave are legitimized so that they shall inherit from and through her ; (2) that if a colored man, a slave, married a woman also a slave, and lived with her until he died, the marriage was legalized; (3) that the issue of such marriage was legitimized ; (4) that there must have been more than mere concubinage to enable issue of the relation to inherit from or through the father, though recognized by him. (II.) *State* v. *Whaley*, 10 S. C., 500, decides that the marriage of two slaves who married before emancipation, and lived together until the act of 1865 was passed, was legalized. (III.) *Dingle* v. *Mitchell*, 20 S. C., 202, decides the statutes applicable to the marriage of a free colored man with a slave, the husband having died in 1852, the son and widow who survived 1872 were his legal heirs, and take under the statute of distributions. (IV.) *Myers* v. *Ham*, 20 S. C., 522, decides that slaves married and living together as husband and wife in 1865, their marriage and offspring were legitimized, though wife had deserted ten years before 1883. (V.) *James* v. *Mickey*, 26 S. C., 270, decides that the marriage of a free colored man with a slave is legalized by the act of 1865,

where they lived together with the intent and in the manner of husband and wife, though no ceremony was performed. (VI.) *Davenport* v. *Caldwell*, 10 S. C., 317, decides that the children of slaves who lived together as husband and wife and died before 1865 are legitimized and inherit from each other.

It is adjudged that the complaint be dismissed.

Both parties appealed.

*Messrs. Parker & McGowan*, for plaintiffs.

*Mr. T. P. Cothran*, contra.

September 7, 1892. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. The facts as agreed upon are as follows: Many years ago, 1843, Green Callahan, a free person of color, was married to one Louisa, a slave, belonging to Mr. Ferguson, of Abbeville. The said marriage was with the consent of Ferguson, and the ceremony was performed in front of his door. Green and Louisa lived as man and wife until about the year 1861, during which time many children were born to them, viz., the plaintiffs, with the children of a predeceased daughter, as set out above. About the year 1861 Green quit the plaintiff, Louisa, and married the defendant, Martha, a free woman of color, and lived with her as man and wife continuously until his death, in 1888. Many children were born of this connection, viz., the defendants and Thomas Callahan, whose name was omitted when the complaint was drawn. Louisa is still living, and testified before the master that she has lived since 1861 near the house of Green Callahan, a part of the time in a house of one "Dick," but, as testified by her, not as husband and wife. It was testified to that Green, after the marriage with Martha, visited Louisa, gave her money and several cows and calves at different times. (This is not admitted as a fact in this agreed statement, but that it was testified to.) Green died seized and possessed of valuable property, real and personal, and left a will, dated April 27, 1888, which has been duly admitted to probate, of

which the following are the important paragraphs: "I will and direct my executor hereinafter appointed do pay all my just debts without delay, and for the purpose to sell any portion of my personal estate which can best be spared. I direct that my estate stand just as it is until my youngest child comes twenty-one years old. I direct that each child, as he comes of age, to have a horse and a cow and calf. I direct that all the rents of the land comes to my wife. I want my first children to have $100 apiece, to be paid to them just as my estate can make it to spare, each one so much apiece."

The complaint alleged that Louisa is the lawful wife, and her children the legitimate children of Green Callahan, and as the youngest child born to Green Callahan and herself was then twenty one years old, that his property be declared intestate, and that the same be divided under the statute of distributions between Louisa and her children; or, if the will stands, then that three-fourths of said property, under the act of 1795, should go to Louisa and her children, they being the lawful wife and legitimate children of said Green, and the act forbidding more than one fourth of a man's property to be left to illegitimates; also asking for an accounting of personal property, and for the appointment of a receiver. The answer of the defendants denies that Louisa is the lawful wife of Green, or that her children are legitimate; that Green married Martha, a free person of color, in 1861, and that she is the lawful wife, and her children the legitimate offspring, of Green; insists that the will of Green must stand, and that Louisa and her children are entitled to no part of the property of which Green died seized and possessed.

The cause was referred to the master, J. C. Klugh, Esq., who made a clear and full report (which should appear in the report of the case), concluding as follows: "I do not think that Louisa can claim any rights from her connection with Green; her children begotten by him are legitimated by the act of 1865, section 4, 'every colored child heretofore born is declared to be the legitimate child of his mother, and also of his colored father, if he is acknowledged by such father.' As stated before, I think that the evidence shows that Green acknowledged these children. The act of 1865 has been repealed (Gen. Stat., 1872, p. 842),

but subject to the provision on page 766, section 4, which declares that such repeal 'shall not affect any act done or right accruing, accrued, or established, * * * before the repeal takes effect.' The legitimation of these children is a vested right, established by that act, and from such legitimation accrued other rights to these children, which cannot be taken away. *Davenport .v. Caldwell*, 10 S. C., 346. My conclusion is that not Louisa, but Martha, is the lawful wife of Green Callahan, and that all the children born to him by both Louisa and Martha are his legitimate children and entitled to inherit from him, the children of a deceased child having equally the right to inherit. Partition now is premature. The will directs that the estate 'stand just as it is until my youngest child comes of age.' Such time does not appear yet to have arrived. When that period does arrive the estate will be probably subject to partition, and the children of Louisa will be entitled to share equally with the children of Martha." And he recommended that the complaint be dismissed, &c.

Upon exceptions to the report the cause came on for hearing before his honor, Judge Norton, who, as we understand it, agreed, substantially, with the master, that the aforesaid enabling acts were retroactive in their character, and had the effect of legitimizing the children of Louisa so far as to enable them to inherit from their father, Green Callahan, but that they did not affect the legality of the second marriage of Green with Martha, which took place between two persons, both capable of contracting, before those acts were passed, and while the first marriage with Louisa was only a moral marriage, &c. From this decree both parties appeal.

PLAINTIFFS' EXCEPTIONS.—I. Because his honor erred in holding that Louisa was not the lawful wife and her children the only legitimate children of Green Callahan. II. Because his honor erred in holding that Martha was the lawful wife and her children the legitimate children of Green. III. Because his honor erred in holding that the acts of 1865, 1866, and 1872, called the enabling acts, did not refer to all marriages of slaves, but only to such as were living together as man and wife in 1865 or 1872. IV. Because his honor erred in holding that the only

exception to the rule, as laid down in exception 3, has been made by the Supreme Court, and only when one or both of the parties are then dead. viz., in 1865 or in 1872. V. Because his honor erred in holding that to legalize this marriage with Louisa under the enabling acts would make Green a bigamist. VI. Because his honor erred in holding that in legalizing the marriage with Martha, Louisa loses no legal rights, her moral rights are recognized from concubinage, and she is made maritally dead."

DEFENDANTS' EXCEPTIONS.—"1. Because his honor held that the children of Green Callahan by Louisa are legitimated as the heirs of Green Callahan, if the court should hold that his honor so held. 2. That his honor should have held that the said children were not entitled to inherit from Green Callahan." They also gave notice that if the Supreme Court is unable to sustain the judgment below upon the grounds stated in the decree of Judge Norton, the respondents will ask that the said judgment be sustained upon the following additional grounds: "That such a construction of the acts of 1865, 1866, and 1872, or any of them, as invalidates the marriage of Green Callahan and Martha Bugg. renders said acts unconstitutional, being in violation of the Constitution of the U. S., art. I., section 10, prohibiting bills of attainder, *ex post facto* laws, or laws impairing the obligation of contracts."

I do not think that the inhibition of the Constitutions of the United States and of this State against bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts, have any proper application to this case. As Mr. Justice Story said in *Watson v. Mercer*, 8 Peters, 88: "*Ex post facto* laws relate to criminal and penal proceedings which impose punishment and forfeiture, and not to civil proceedings which affect private rights retrospectively." There is here no punishment or penalties. but the matter is purely civil.

This court has often held that the acts of 1865, 1866, and 1872, sometimes called the "enabling acts," in reference to the new status given to former slaves by emancipation, were intended to be, and are, retrospective in their operation.

The emancipation of slaves entirely changed their status. It was a new condition of things, when a whole class of persons,

formerly slaves, without civil rights, had conferred upon them the rights of citizens, to acquire property and to contract and be contracted with as to all matters, not excepting marriage. As was said in the late case of *Clement* v. *Riley* (33 S. C., 66), the anomalous condition of those who had been in slavery was at once apparent, and the legislature, probably feeling that it was in accordance with "natural justice that they should inherit from each other, passed said acts for the avowed purpose of establishing and regulating the domestic relations of persons of color, and to legalize certain marriages among them." The whole subject, from its nature, was in the past. And while that circumstance undoubtedly increased the difficulty, there can be no doubt that the legislature intended them to be retroactive; for, otherwise, there was nothing to which they could apply, the persons referred to being under the general law as to the future. The acts were intended to be retroactive, and we agree with the master, that under their operation, the evidence shows that the marriage with Louisa was a moral marriage, and her children born during the connection and acknowledged by their father, are entitled to inherit from their father, Green Callahan, just as if they were his children by a first wife.

But as to Louisa herself, the matter is not so clear. Her marriage with Green was only moral in its character, lacking legality, and before it was validated by the aforesaid acts Green married Martha Bugg, both of them being free persons of color and entitled to contract matrimony. Did that marriage give to the contracting parties such vested rights as to place them beyond the operation of the enabling acts? It will be observed that the aforesaid acts make no direct reference to such cases as this, and whatever effect they may have upon such, is entirely incidental, produced by the fundamental law of marriage, which, in this country at least, recognizes no other than the first in the order of time. If Martha had been in the same condition as Louisa, that of a slave, possibly a question might have arisen as to which marriage should be recognized, as that with Louisa was the first in the order of time. But in the last marriage with Martha, both the contracting parties were free per-

30—36

sons of color, and competent to contract legal marriage, and they did, in fact, marry before the enabling acts were passed.

Different opinions have been expressed by the most eminent jurists as to the nature of the contract of marriage. Judge Story, in his opinion in the *Dartmouth College Case*,[1] denied the power of a legislature to dissolve even the contract of marriage without a breach on either side, and against the wishes of the parties. A dissolution of the marriage obligation, without any default or assent of the parties, may as well fall within the prohibition of the Constitution, as any other contract for a valuable consideration, &c. While in *Maguire* v. *Maguire*, 7 Dana, 184, Chief Justice Robertson "considered the contract of marriage to be *sui generis*, and unlike ordinary or commercial contracts, it was *publici juris*, and created by the public law subject to the public will, but not to that of the parties, who could not dissolve it by mutual consent. It was much more than a contract. It established fundamental domestic relations, and he did not think it was embraced by the constitutional interdiction of legislative acts impairing the obligations of contracts," &c. But without entering now into the argument, whether marriage is only a political and *social status*, we cannot doubt that, whatever else it may be, under our law, it is as well "*a civil contract*," and confers valuable vested rights.

We do not understand that the Constitution of the United States prohibits the States from passing *retrospective laws*, divesting antecedent vested rights of property, provided such laws do not impair the obligation of contracts, or partake of the character of *ex post facto* laws. As Chancellor Kent says: "A retrospective statute, affecting and changing vested rights, is very generally considered in this country as founded on unconstitutional principles, and consequently inoperative and void. But this doctrine is not understood to apply to remedial statutes, which may be of a retrospective nature, provided they do not impair contracts or disturb absolute vested rights, and only go to confirm rights already existing, and in furtherance of the remedy by curing defects, and adding to the means of enforcing existing obligations. Such statutes have been held valid when clearly just and reasonable, and conducive to the general welfare, even though they

---

[1] Trustees of Dartmouth College *v.* Woodward, 4 Wheat., 518.

might operate in a degree upon existing rights, as a statute to confirm former marriages defectively celebrated, or a sale of lands defectively made or acknowledged." See 1 Kent (13 ed.), p. *456, and notes. The general rule undoubtedly is, that vested rights are not to be disturbed, but, as Mr. Sedgwick says: "The legislature has the power to pass retrospective laws to accomplish just and proper ends. A retrospective law may be just and reasonable, and the legislature has the right to pass one of that description. I believe that no person will deny that the exercise of legislative authority only, and without further consequences, to confirm marriages not duly celebrated, is valid, although clearly retrospective and manifestly operative on the rights of individuals," &c.

Believing, as I do, that the so-called enabling acts were wise and humane, so far as they were intended to cure defects in marriages merely moral between persons who were slaves at the time the relation commenced—especially with reference to enabling their offspring to inherit from them—that for such purpose the acts, though in character retrospective, were not illegal or unconstitutional, at the same time I think that they were not intended to apply to a marriage between persons of color, where both the man and the woman were competent to contract marriage. Such a marriage did not need the aiding hand of the legislature, and, therefore, was not within the purview of the acts, as, for instance, the important act of 1872, now embraced in sections 2030 and 2031 of the General Statutes, expressly declares that "all persons who, *previous to their actual emancipation*, had undertaken and agreed to occupy the relation to each other of husband and wife, and are cohabiting as such, * * * whether the rites of marriage have been celebrated or not," &c.

It seems clear that this act was not intended to apply to the marriage of free persons of color who were not "emancipated," but only to the moral marriages of those who were slaves at the time, and up to the general "emancipation." This being the case, it seems to me that it would be a forced construction to hold that the act could annul a marriage between free persons of color, either directly or indirectly, by legalizing a former marriage merely moral, because of the incompetency of one of the parties

to contract a legal marriage. The necessary result is that Martha Bugg was the legitimate wife of Green Callahan, and her children his legal heirs. But we agree that, Green Callahan having acknowledged the children of Louisa to be his, they also, by force of the statute, are his heirs as to any portion of his estate which may be intestate, as if they were children of a first wife now deceased. But the question of distribution is at this time premature.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.