The following Opinion, delivered by

Chief Justice Robertson,

on the 28rd of June last, was then ordered to he suspended until the 10th day of the next term — this day. No change having been made, in the mean time, it now fakes effect as the final decision of the Court in the case.
Anne F. T. Fitzhugh having, in November, 1833, intermarried with John H. Maguire, in the State of Yir-ginia, where they were both then domiciled, and having, within a few weeks afterwards, removed with him to Mobile in the State of Alabama, which then became and yet is his place of domicil — abandoned him early in' the year 1835] and, having eeme to Louisville in this State, filed, in the Chancellor’s’Court of that city, a bill in chancery against him, as a non-resident, in December, 1835, praying for a divorce, and for general relief, in consequence of alleged inhumanity and barbarity.
After publication against him, he came to Louisville, and filed a demurrer to the jurisdiction oF the Court, and an answer, denying the imputed mistreatment, and resisting the prayer for a divorce, and that also for general relief.
The Chancellor' — being of the opinion that he had jurisdiction, and that the act of assembly of this State, prescribing the mode of obtaining divorces for causes therein enumerated, applied to the facts of the case— rendered a decree of divorce a vinculo matrimonii, allowing the wife to marry again after the expiration of two years, and interdicting a future marriage by the husband; and also securing to her all the property owned by her in her own right at the time when she was married.
This writ of error brings up that decree for revision.
The court of appeals has no authority to revise a decree of any court of equüy °f this State, granting a divorce— even tho’ the decree may bedeem ed void for want the^o^rt^hat rendered it.
So much of any decree m a dilates to the prop tieY,is^subjeefto revision in the court of appeals; and, in such revision, it may be necessary for the court, incidentally, to determine whether the court that rendered the decree had jurisdiction, and, consequently, whether the decree was valid or void; and, if a want of jurisdiction appears — though the de cree for a divorce cannot be touched — what relates to the property will necessarily appear to be unauthorized, and must be reversed.
The decree for a divorce cannot be revised by this Court; because, by the first section of a statute of 1816 0f this State, it is enacted — “ that no writ of error shall “ be brought or sued out from any Court in. this Com- “ monwealth, to reverse the decree of any court of “ equity, hereafter obtained, granting a divorce from the „ n , , H13.lT13.g6 COIltr3Ct.
The principal, perhaps the only, reason for the enact-i r r . L. / ’ , ment of 1816, was the inconvenience that might result from annulling a valid'divorce, upon a writ of error which ° • 7 r might be prosecuted after one of the divorced parties had contracted another marriage: and that reason does not apply to a void divorce, which could never legalize a subsequent marriage of either of the parties. And it may be that, an act of 1809 having prescribed the causes for which, and the cases in which, courts ’of equity in this State may decree divorces a vinculo — • the subsequent enactment of 1816, interdicting writs of error which had not been previously forbidden, contemplated only such divorces as shall have been decreed under the authority of the former act, and was not intended to apply to divorces decreed, without any authority, in a case, or for a cause, not embraced by this statute of 1809.
But whatever may have been the more probable motive for enacting the inhibitory statute of 1816, it is so clear and comprehensive in its provisions, that we do not feel authorized, upon any speculation concerning a presumed object not disclosed on its face, to restrict its application to one class of decrees for divorce. We feel bound to apply it as comprehensively as the Legislature has made it applicable; and that is, to all divorces decreed by a court of equity in this State.
But nevertheless, this Court, having undoubted juris-q¡ction to revise the decree respecting the property, will be compelled incidentally to consider the question jurisdiction by the Chancellor to decree the divorce; *183 because, as the decree as to property operates on the title only, and therefore, is in personam and not in rem, and as the plaintiff in error, by his appearance and answer, waived all personal objection to jurisdiction, there can, we think, be no objection to the manner in which the Chancellor divided the estate, if he had authority to divorce the parties. But if he had no such authority, the decree concerning the estate was erroneous, and should be reversed, even though the decree for the divorce cannot be disturbed on this writ of error; for, as jurisdiction to decree a divorce could alone have given authority to distribute the estate: therefore, if the Chancellor had no such jurisdiction, we must reverse his decree so far as it concerns the title to estate.
The act authori-ces, gives but a tíon — whiclfcan ?ot be ei?lai'ged by a waiver of objections. It band who was never domiciled here; nor will his appearance and answer, after bill does not author ize the proceeding against ahus filed,confer the ju Vlde
Of the nature of trac™-which,s«t generis, differs from all other contracts; and cannot be dissolved by the parties; but may be by the sovereign power, exercised in legislative or judicial form, as the cause may justify, with or without the consent of both parties; and is not within the constitutional inhibition of legislative acts impairing the obligation of contracts.
The question of jurisdiction to decree the divorce, being thus necessarily involved, so far as it affects the decree respecting the property, is the only one which will be considered in the revision of that decree.
And here it may be proper to premise that, if, when the bill was filed, the Chancellor had no jurisdiction over .the subject of the divorce, the subsequent appear-anee and answer by the husband co,nld not have given jurisdiction to dissolve the marriage contract, even had , , , . ... , . there been no demurrer; because, it the subject matter m this case, was beyond the cognizance of the Chancellor, ... . . who has a limited jurisdiction only m divorce cases, no waiver of objection, express or implied, could have conferred jurisdiction.
If the statute of 1809, authorizing decrees for divorce for certain enumerated causes, does not give authority to decree a divorce in invitum against a husband who was never domiciled in Kentucky, the Chancellor had no jurisdiction in this case; because the fact upon which his jurisdiction depended, was admitted not to exist. Rose vs. Himely, Cond. R. 101.
4 Marriage, though, in one sense, a contract — because, eing both stipulatorv and consensual, fit cannot be *184 valid without the spontaneous concurrence of two competent minds — is nevertheless, sui generis, and unlike ordinary or commercial contracts, is publici juris, because it establishes fundamental and most important domestic relations. And therefore, as every well organized society is essentially interested in the existence and harmony and decorum of all its social relations, marriage, the most elementary and useful of them all, is regulated and controlled by the sovereign power of the State, and cannot, like mere contracts, be dissolved by the mutual consent only of the contracting parties, but may be abrogated by the sovereign will, either with or without the consent of both parties, whenever the public good, or justice to both or either of the parties, will be thereby subserved. Such a remedial and conservative power is inherent in every independent nation, and cannot be surrendered or subjected to political restraint or foreign control consistently with the public welfare. And therefore, marriage, being much more than a contract, and depending essentially on the sovereign will, is not, as we presume, embraced by the constitutional interdiction of legislative acts impairing the obligation of contracts. The obligation is created by the public law, subject to the public will, and not to that of the parties. So far as a dissolution of a marriage by public authority, may be for the public good, it may be the exercise of a legislative function; but so far as it may be for the benefit of one of the parties, in consequence of a breach of the contract by the other, it is undoubtedly judicial. And when thus altogether judicial, it may be beyond the authority of a Kentucky Legislature, which, under our State constitution, cannot exercise any power clearly and purely judicial.
The act of 1809, concerning divor ces, is constitutional. But it does not apply where the husband was never resident,domiciled or commorant here; nor give any jurisdiction in such a case.
But the statute of 1809, authorizing the Circuit Courts of this Commonwealth to decree divorces for certain causes therein prescribed, is free from any constitutional objection. £
The Chancellor proceeded under that statute; and if it did not apply to the case, he had no jurisdiction.
But we are satisfied that the statute of 1809 was not intended for such a case as this: in which the husband *185 had never been a citizen or a domiciled resident of this State, or even commorant within its borders, and where even the wife does not appear to be a permanent resident of Kentucky.
No State or na-^"dissoive^he m¡miago conS^o^fy oth erstateornation, domiciled within the of the attempting to ex eroise the power. But where a hus band and wife, ího/ c?J,tirraing their own conn-^miriledfbona fide, in another, stems^may’reg-u,ate>OT even ab úSa*’contract*: but whether U.1UIW SUUUlUj ill such case , be more than a tem porary separation, a mensa et thoro. ■
Marriage being, as already suggested, an organic institution in every civilized and well regulated nation, no such nation can preserve its own social order, or enjoy its independent right to secure its own welfare in its own way, if any other sovereign could, without its consent, dissolve or disturb that domestic relation of its citizens which is most essential to its prosperity, moral power and happiness. To concede such a right of foreign interference, would be as suicidal in principle . , . „ _ r r as to acknowledge ioreign control over any other institution, or the term firma of a State. And therefore, it would seem to be sufficiently obvious, without the light of direct judicial authority, that no nation should ever arrogate any such power over the marriage contracts of foreigners not domiciled within its jurisdictional limits, and that no free State, regardful of its rights or its dignity, should ever, by acquiescence, or otherwise, recognize any such assumed right of intermeddling with its domestic institutions, by any foreign State.
But this deduction from first principles is fortified by many adjudged cases, and has been sufficiently recognized as the established doctrine of international, as well as of the common law in England and in many, if not most, of our North American States. There may be an exception in those cases in which husband and wife, whilst continuing citizens, either in law or in fact, of one nation, become bona fide domiciled within the jurisdiction of another nation; for it seems to be the prevailing modem opinion, that the conjugal rights and relations may always be regulated, and sometimes, if not always, abrogated, by the sovereign of the actual domicil, if established in good faith. Whether, in such a case, the power over the contract of marriage should be limited to a temporary separation of the parties a mensa et thoro, we shall not now pause to decide or consider; because it is admitted that the defendant in error had never been *186 either a citizen of Kentucky, or even commorant within her borders.
Wherever the do lnieil of a husband is, there also, in legal contemplation , is that of the wife; ■even though she may have separated from him, and have an actual residence elsewhere.
A wife residing here, of a man who was never domiciled here, would certainly be entitled to the protection of the law ; and the sovereign power might even dissolve the legal, as well as the actual, union between them, so far as the courts and citizens of ■this State were concerned ; but such act would have no extraterritorial operation ; and the divorce laws of this State were never intended to apply when neither the residence nor do-micil of the husband, nor the selected , permanent abode of the wife, is in this State. The prohibition of another marriage,by a husband to whose wife a divorce is granted, who was never sidled ’ in^tlfia-State.
*186 It is also well settled by elementary writers on comity and by adjudged cases, that, jure gentium, the domicil of the wife is that of her husband, and that, without his consent, (acting as she then does in alieno jure,) she cannot change her legal domicil, though she may actually leave her husband, and change her residence.
Therefore — according to the facts admitted in this case — when the suit was commenced, and when the decree was rendered, the city of Mobile .in the State of Alabama was, in judgment of law, the domicil of the fugitive wife, as well as of her still abiding husband. She may have had good cause for leaving him; but, though her actual residence may have been changed to Kentucky, her legal domicil was still in Alabama.
We do not intend to decide that Kentucky might not protect her in the enjoyment of her selected home; nor do we mean to deeide that the sovereign power of Kentucky — disregarding the laws of comity and all foreign consequences, might not even dissolve the legal, as well as the actual, union between her and her husband, within the limits of this State, and so far as its own citizens and courts may be concerned.
But the legislation of Kentucky cannot, proprio vigore, have any extra-territorial operation, except so far as citizens of Kentucky may be concerned; and as, more•over, the application of the statute of 1809 to such a case as this, would be inconsistent with the international laws of comity, and might lead to obviously embarrassing conséquences to the parties themselves, elsewhere than here, it is our duty to presume, ?.s the contrary is not intimated by any of its provisions, that it was not intended' for any such a case. Although it provides for publication against a non-resident husband or wife, it should not therefore be construed as being applicable to a case in which a husband never was a resident of this State, and in which, as might be inferred in this case, the wife had not become permanently or in good faith, a resident of this State; but had, as may also be inferred, only come and resided here transiently, for the *187 purpose of obtaining a divorce. The complainant did not even intimate in her bill that she had settled or intended ever to settle herself in Kentucky, as her permanent home. And surely, the statutory declaration, that the delinquent party shall never marry again without incurring the penalties denounced for bigamous connexions, could not have been intended to apply to husbands who had never been either citizens or domiciled residents of Kentucky, and as to whom, therefore, such a denunciation would be apt to be a mere brutmn fulmen.
Objections to the J^sdiction of a court of eq. over an absent def’t, yjated'b^hís ap" pearing and filing a“ ^u^statute does not confer Jcree a divoroe a vinculo, against a husband never domiciled in this State — his appearing and answering the bill will not obviate the objection of want of jurisdiction. Nor can the jurisdiction result from the fact, that the wife is an infant, and, as such, entitled to the protection of the chancellor : he has no more power to grant a divorce to an infant, than to an adult. But — Though the powers of chancellors in this State are merely judicial and statutory, and are far from being co-extensive with the prerogative powers exercised by the chancellor of England — it is competent for a chancellor here to protect an infant from an abuse of parental authority, and to protect a wife, infant or adult, from abuse or injury by a brutal husband.
The divorce decreed in this case, would not, we presume, be recognized as valid by the courts of Alabama. If the wife of a citizen of Kentucky, domiciled here, should abandon him, go to another State, and there instantly ask for and obtain from the Court or Legislature of such State, a divorce a vinculo, would any Court in-Kentucky ever recognize such a divorce as valid, when-called in question here? If it would, a principle would be thereby conceded which might subject the entire domestic, order and peace of our State, and the most cherished rights of its citizens, to foreign control, and subvert its own policy respecting the sacredness of that union which is the fountain of domestic purity, and the first parent of social order and civilization.
But the act of 1809 does not purport to go beyond the just and prudent limits of undoubted authority and policy!
We are, therefore, of the opinion that the Chancellor of Louisville had no jurisdiction to decree a dissolution J of the marriage contract. The objection to the jurisdiction is not the non-residence of the husband; for though, to give jurisdiction in personam, either actual notice, or personal appearance, or some other proper defendant within the cognizance of the Court, would have been indispensable, yet this objection, being merely personal, may have been waived by appearing and filing an *188 answer, which may have overruled the demurrer. But jurisdiction over the person of the husband, conceded by his appearing and answering the bill, did not give the Chancellor authority to decree a divorce a vinculo; because, if the Legislature had the power to confer such authority, it has never done so, and therefore, the Chancellor’s decree, being wiira-judicial, must be deemed void here, as well as elsewhere; unless, as assumed by him, the fact that the wife was an infant, was sufficient, per se, to give him, as Chancellor, a peculiar and extraordinary power over her marriage bonds, which he would not have possessed on any other ground than that of infancy. But in this assumption, we cannot concur. In England, the crown has delegated to, its Chancellor much of the prerogative authority which, as parens pa-trien, it once possessed over infants, lunatics and idiots. Most of these delegated powers, though official, are personal, and merely ministerial, and do not belong either to the Chancellor as a judge in equity, or to the Court of Exchequer, or any other British court of equity. And even the Chancellor of England, in all the plenitude of his personal authority over the marriages of infants, was restricted to the wards of court, and could not, merely as Chancellor, dissolve the legal marriage of even such a ward, especially if it had been consummated before he had acquired jurisdiction over the person of the infant.
But a court of equity in this State certainly does not possess all the powers of the Chancellor of England. All its powers are judicial; and the Chancellor of Louisville has no other judicial power than such as is either equitable or statutory. He has not, therefore, all the authority in cases of infancy which, as a minister of the crown, the Chancellor of England possesses. As a judge in equity, he may protect an infant from injury by a perversion or prostitution of the parental trust; or may protect either an infant or an adult wife from abuse and injury by a brutal husband; because, in either case, there being either no legal remedy, or none that is adequate, a court of equity may interpose and prevent irreparable wrong. But he has no more power to divorce an infant than an adult wife.' If, the wife be *189 ing over twenty one years of age, he would have no jurisdiction to dissolve her marriage, the fact that she is under twenty one years of age, surely could not alone give him such jurisdiction. Infants are justly treated with more indulgence than adults in courts of equity; and all courts should be peculiarly vigilant in guarding the interests of infants, and of every other person who is not, in fact or in law, able to exercise full and proper personal discretion. The disability of marriage entitles a feme covert to-peculiar favor and cai’e in courts of justice. That alone cannot, however, give to any court jurisdiction to divorce her from her husband. And we cannot admit that, in this respect, the disability of infancy can confer on a court of equity more power than that of coverture could confer; or that infancy alone-can give jurisdiction to decree a divorce a vinculo.
A decree for alimony must secure to the wife an annuity , or other personal right to maintenance: an absolute right to property cannot be decreed in a cáse for alimony.
As the bill in the case does not appear to have been filed for any such temporary and partial purpose as that of obtaining alimony merely — we should not intimate whether the Chancellor would have power to render any decree for such limited purpose.
But the decree itself is not for alimony; and, if it had been such, it would be erroneous, because it does not secure to the wife, as wife, an annuity, or other personal right to maintenance; but it purports to confirm to her, as a feme sole, the absolute title to property; which should never be done in a case of mere alimony. Nor could the Chancellor, even on the return of the cause to his court, render a decree for alimony, as long as his decree for dissolving the marriage shall remain untouched.
Wherefore, it is decreed and ordered that the writ of error, as to the decree for a divorce, be dismissed for want of revisory power by this Court; and that the residue of the decree be reversed, and the cause remanded, with instructions to dismiss the bill so far as it seeks a decree for property.