CASE 7—IN EQUITY—JUNE 3.

# Rose, Etc. v. Rose, Etc.

APPEAL FROM LOGAN CIRCUIT COURT.

MARRIAGE—VESTED RIGHTS—EFFECT OF ACT OF 1894.—A marriage entered into before the passage of the married woman's act of March 15, 1894, and the acquisition of real estate by the wife before that act, vested the husband with the statutory right then existing to rent the land and receive the proceeds, which the Legislature was without power to devest.

WILBUR F. BROWDER FOR APPELLANT.

The act of 1894, March 15, was intended by the Legislature to readjust marital rights, as well existing ones as those thereafter to be acquired; and is no violation of the Constitution of the United States. Constitution, sec. 10 art. 1; Ky. Stats., sec. 2128; Cabell, et. al. v. Cabell's Admr., 1 Met., 319; Maguire v. Maguire, 7 Dana, 184; Gaines v. Gaines, 9 B. M., 308; Prichard v. Citizens' Bank, 28 Am. Dec., 132; Gen. Stat., chap. 52, sec. 6; Azbill v. Azbill, 92 Ky., 154; Carson v. Carson, 40 Miss., 349; Berthelemy v. Johnson, 3 B. M., 90; West v. West, 2 Mass., 233; Bigelow v. Bigelow, 108 Mass., 38; Percy v. Cockrill, 53 Fed. Rep., 872; Bruce v. Bruce, 11 Sou. Rep., 197 (Ala.); Hart v. Leete, 15 S. W. Rep., 976 (Mo.); Irvine v. Puryear, 7 S. W. Rep., 449 (Ark.); Alexander v. Alexander, 7 South Eastern Rep., 335 (Va.); Cooley on Const. Lim., top page 346, 5th ed.

JAMES H. BOWDEN FOR APPELLEE.

1. The act of March 15, 1894, was not intended to affect the rights of husband and wife as to each other. Matson v. Matson, 4 Met., 262; Kalfus v. Kalfus, 12 Ky. Law Rep., 893; s. c. 92 Ky., 542.

2. The Legislature has no power to devest the husband of the rights vested in him by the marriage. 62 Am. Dec., 160 and notes; 68 Am. Dec., 618; Rose v. Sanderson, 38 Ill., 250; Clark v. Clark, 20 Ohio St., 128; Irvine v. Puryear, 50 Ark., 356; Burson's App., 22 Penn., 164; Wyatt v. Smith, 25 West Va., 813; 19 L. R. A.,

Rose, etc., v. Rose, etc.

247; Myer on Vested Rights, pp. 31 to 35; Ky Stats., secs. 2127, 2128; Dixon v. Dixon's Exr., 23 Am. Dec., 478.

JUDGE PAYNTER DELIVERED THE OPINION OF THE COURT.

It appears from the petition, to which the court sustained a demurrer, that the appellant is the wife of appellee J. A. Rose; that they were married in the year 1890; that a separation has taken place, which is permanent; that they will never live together as husband and wife. It also appears from the petition that after the marriage took place, and before the passage of the act of 1894 (sections 2127, 2128, Ky. Stat.), defining the rights of married women, the appellant by gift acquired title to a tract of land containing 308 acres, and by purchase another tract of 120 acres. It is alleged that the husband is in possession of the land, and refuses to surrender it to the appellant. She therefore prays that the possession of it be adjudged to her. The question involved is whether under the act referred to, the rights of the husband—as they existed at the time of its passage—to the use of the land have been destroyed; that is to say, did the legislature intend to deprive husbands of their interests in the lands of their wives, or, if it so intended, did it have the power to do so?

At common law the husband became the owner of the personal property of the wife. He likewise became seised of an estate for their joint lives of her freehold lands and chattels real. He could sell the personal property thus acquired, and vest the vendee with a title thereto. He could sell the interest which he acquired in the real estate, and vest the purchaser with the title to the interest which became vested in him by operation of law. 2 Dembitz, Land Titles, 788; 2 Kent, Comm., 130; 2 Bl. Comm., 126.

[4]

The court held in McClain v. Gregg, 2 A. K. Marsh. 454, that marriage gives the husband an estate in the lands of his wife, which he could sell, and that his vendee could maintain ejectment. That opinion was before an act of the Legislature reducing the interest of the husband in the wife's land. A divorce restores to the wife the exclusive right to her land. Hays v. Sanderson, 7 Bush, 489. As civilization advanced, and as the men who made the laws began to recognize that a wife should not be compelled to surrender practically all of her estate to the husband, but should be given a reasonable protection in the enjoyment of her property, the Legislature of Kentucky passed an act which supplanted the common law with reference to the rights of a husband in his wife's real estate. It is section 1, art. 2, c. 52, p. 720, Gen Stat., and reads as follows: "Marriage shall give to the husband, during the life of the wife, no estate or interest in her real estate, including chattels real, owned at the time, or acquired by her after marriage, except the use thereof, with power to rent the real estate for not more than three years at a time, and receive the rent. If, however, the wife die during the term for which her land is rented, the rent shall go to the husband, if alive, subject to her debts, contracted as stated in the next section. But if during such term the husband die, the rent accruing thereafter shall go to the wife or her representatives, subject to her debts as aforesaid." This section was in force at the time the parties to this action were married, and at the time the wife acquired the land. It gives the husband the use of the wife's land, with power to rent it for not more than three years at a time, and receive the rent. It does not allow this rent to be subjected to the payment of his debts, because the Legislature thought it wise to place it in the power of the

husband to appropriate the rents for the benefit of his
wife and children, if he chose to do so.  In obedience to
the requirements of the statute, this court has repeatedly
held that the rents of the wife's land could not be sub-
jected to the payment of the husband's debts.  If the hus-
band cultivates the land himself, then the products of the
land have been adjudged to belong to him.  The court, in
Moreland v. Myall, 14 Bush, 474, held that corn standing
on the wife's land (her general estate) is subject to levy
and sale under execution against the husband.  While the
rent of the wife's land is not liable for the husband's debts,
yet, as between the husband and wife, the rent belongs
to him.  Barnes v. Burbridge, 7 Ky. Law Rep. 445.  While,
under the act in force when the parties married and when
the land was acquired, the husband's interest in the wife's
land was not so great as at common law, still it is a vested
right; and the Legislature could not deprive him of the use
of his wife's land, and the right to rent it for three years at
a time.  The act of 1894 declares that marriage shall give
to the husband no interest in the wife's property, and that
she shall hold it and own it for her separate and exclusive
use, free from the debts and control of her husband.  The
act is not retrospective in its operation.  It can not take
from a husband the rights which existed under the law
in force at the time of its passage.  It is said by Mr.
Cooley, in his work on Constitutional Limitations (5th Ed.
p. 442):  "At the common law the husband, immediately
on the marriage, succeeded to certain rights in the real and
personal    estate    which    the    wife    then    possessed.
These rights became vested rights at once, and any sub-
sequent alteration in the law could not take them away."
It   is   held   in   Junction   Railroad   Co.   v.   Harris,  9
Ind.   184   [68   Am.   Dec.,   618],   that   a   husband's

estate in the wife's land is not impaired by a statute declaring it separate property. Under the law of New York, a husband had a certain interest in his wife's property. Subsequently the Legislature passed an act which, in effect, declared that such property should no longer belong to the husband, but should become the property of the wife, as though she were a single female. The court held that the husband's rights could not be impaired by the act of the Legislature. Westervelt v. Gregg, 12 N. Y. 202. It was held in Rose v. Sanderson, 38 Ill. 247, that a legislative enactment can not take from the husband a vested life estate in the wife's land, and give it to her. Bishop on the Law of Married Women (volume 2, section 40), after stating what are the rights of the husband at common law in the wife's real estate, says: "This is a vested estate in him; and, within the doctrine discussed under our first subtitle, it is not competent for legislation, without his consent, to take it from him and give it back to the wife." The views we have expressed are supported by Jackson v. Jackson, 144 Ill. 274 [33 N. E. 51]; Clark v. Clark, 20 Ohio, 135; Wyatt v. Smith, 25 W. Va. 813. Many authorities could be cited in support of these views. A wife who was married before the act of 1894 took effect is entitled to all the rights in property acquired after the act took effect which it purports to give her. Although the marriage took place before the act took effect, the husband has no right to complain that the Legislature has given his wife the control of such property as she acquired after the act took effect. The act did not impair any vested right of the husband in property so acquired. His right was expectant, not vested. Mr. Cooley in his work on Constitutional Limitations (page 443), in speaking in regard to the husband's expectant interest in the after-acquired

property of the wife, said: "It is subject to any changes made in the law before his right becomes vested by the acquisition." In Allen v. Hanks, 136 U. S. 300 [10 Sup. Ct. 961], it was held competent for a State, in its fundamental law or by statute, to provide that all property thereafter acquired by or coming to a married woman shall constitute her separate estate, not subject to the control or liable for the debts of the husband. Such requirements do not take away or impair any vested rights of the husband. The same doctrine was announced in Jackson v. Jackson. It is hardly necessary to observe that, if Mrs. Rose should be divorced from her husband, she is entitled to be restored to the possession and use of her land; or should she, in an appropriate proceeding, show herself entitled to alimony or equitable settlement, the products of her land, or the rents thereof, would be subject to the payment of it in the same manner and to the same extent as they would be if the land belonged to the husband. This is upon the idea that the products of the land, or the rents of it, belong to him.

The only case to which the court's attention has been called which militates against the conclusion we have reached, as to the incompetency of the Legislature to take from a husband his vested rights, is the case of Rugh v. Ottenheimer, 6 Or. 231. To sustain its conclusion in that case, the court cited Maguire v. Maguire, 7 Dana, 183. A similar question to the one involved in this case was not before the court in the Maguire case; neither did the court express an opinion on a question like the one involved in this case. The part of the opinion which the Oregon court relied upon to sustain its conclusion was dictum, and that does not even sustain the conclusion of the court. The court in Gaines v. Gaines, 9 B. Mon. 308, did not ad-

here to the doctrine which was declared in Maguire v. Maguire, but said: "And if it were conceded, as intimated in Maguire v. Maguire, *supra*, that the marriage contract is not, as a contract, wholly removed, like other contracts from the power of the Legislature to dissolve it in any particular case by special act of divorce, and that the dissolution of a marriage, if required by the public good, may be a legislative function, still it can not be admitted that a power thus deduced, uncertain, upon principle, as to its existence, and still more uncertain as to the grounds of its legitimate exercise, can override the express and highly conservative prohibitions in the Constitution, intended for the protection of private rights of property. We are of opinion, therefore, that whatever power to be exercised in view of the public good, the Legislature may have to enact divorces in special cases, as it can not, even for the public good, change the right of private property from one to another without compensation, much less can it do so by a special act of divorce, sought by one of the parties against the consent of the other, with the purpose or effect of operating upon the rights of property incident to the marriage relation, as created and sustained by the general laws applicable to that relation." The act of the Legislature in question does not attempt to dissolve the marriage contract, nor does it give any additional grounds upon which a court might do it. So the dictum in the Maguire case, to-wit, "and therefore marriage, being much more than a contract, and depending essentially on the sovereign will, is not, as we presume, embraced by the constitutional interdiction of legislative acts," could be regarded as a correct statement of constitutional law, and still would have no application to the question at bar.

We have not felt it necessary to discuss marriage as a social relation, nor the necessity of the regulation and control of it by the sovereign power of the State. Neither have we felt it necessary to discuss the question as to · the power of the Legislature to prescribe the causes for which the marriage contract or relation may be dissolved. Neither would it be profitable to determine the question whether marriage is a contract *sui generis*, or one *publici juris*, or both. The marriage relation was assumed by the parties, it still exists, and no effort is made to have the court dissolve it. The questions we have been called upon to determine were: (1.) What rights did the marriage give the husband in the wife's property? (2.) Can the rights thus acquired to be taken from the husband by the Legislature and given to the wife? Our conclusions are supported by the common law, by the consensus of judicial opinion, and by the ablest writers on constitutional law. We have thought it neither wise nor judicial to disregard the rules of law, which are the crystallization of judicial opinion. Neither do we think, because lawmakers may have been slow in giving to wives freedom in the control of their property, that we should give our sanction to a law which, if upheld, will take the property of the husband and give it to the wife. If change and transition are to take place in the domestic relationship, although right and for the public good, still it should not be done at the sacrifice of vested rights. Judgment affirmed.

JUDGE DuRELLE dissenting.

The question presented in this case is whether the statutory right given to the husband by the act of 1846 (2 Rev. Stat. 8) to the use of the wife's land, with power in him to

rent it for not more than three years at a time, can be
taken from him by legislation adopted subsequent to his
marriage.   It is provided in the act of March 15, 1894 (sec-
tion 2127, Ky. Stat.), that "during the existence of the mar-
riage relation the wife shall hold and own all her estate
to her separate and exclusive use, and free from the
debts, liabilities or control of her husband;" and this
suit is brought under the clause quoted, for the recovery
of possession of the wife's land.   In dissenting. from the
opinion of the majority in this case, it is essential to an
understanding of the reasons of the dissent that the
views of the minority upon the institution of marriage,.
and the peculiar limitations which have been placed by
the courts. upon the scope and effect of the so-called
marriage contract, should be stated.   To do this in the
shortest mode, I have strung together, without unneces-
sary comment, extracts from the opinions and writings of
judges and law writers who are properly esteemed to have
given this subject most careful consideration and philos-
ophic thought.   Most of these extracts, and many more
may be found in Bishop's Marriage, Divorce and Separa-
tion:

"The word 'marriage' is used in two senses.   It may
mean the solemnity by which two persons are joined to-
gether in wedlock, or it may mean their status when they
have been so joined.   Cotton, L. J., in Harvey v. Farnie,
6 Prob. Div. 35, 47.   In like manner the expression 'agree-
ment of marriage' denotes either a contract between par-
ties to solemnize together a marriage at a future time, or
the solemnization itself.   The term 'contract to marry'
never points to an actual, executed marriage, but 'con-
tract of marriage' often does.   We have, therefore, three
things:  First, an agreement to enter into a marriage;

secondly, an agreement of present marriage; and, thirdly, the status of marriage, imposed on the parties by the law as the consequence of their agreement of present marriage, oftener expressed by the single substantive word, 'marriage.' A failure to keep in mind these distinctions has led to not a little confusion in our law books." Bish. Mar., Div. & Sep., section 9. "Marriage, as distinguished from the agreement to marry and from the act of becoming married, is the civil status of one man and one woman legally united for life, with the rights and duties which, for the establishment of families and the multiplication and education of the species, are, or from time to time may thereafter be, assigned by the law to matrimony." Id., section 11. "That marriage, executed, is not a contract, we know, because the parties can not mutually dissolve it, * * * because legislation may annul it at pleasure, and because none of its other elements are those of contract, but all are of status." Id., section 13. "The mere agreement to marry is not essentially different from other executory civil contracts. It does not superinduce the status, and, on its violation, the injured party may recover his damages of the other. But when it is executed, in what the law accepts as a valid marriage, its nature as a contract is merged in the higher nature of the status. And though the new relation—that is, the status —retains some similitude reminding us of its origin, the contract does in truth no longer exist, but the parties are governed by the law of husband and wife. In other words, their prior mutual promise to marry was simply an undertaking to assume the marital status; and, on its assumption, the agreement, being fully performed according to its terms, bound them no longer." Id., section 14. "There may be, and sometimes is, an antenuptial bargaining be-

tween the parties, to survive the assumption of the status, more or less regulating their property relations, yet in no degree qualifying the status itself." Id., section 15. "Lord Robertson, a Scotch judge, in a passage approvingly quoted by Judge Story and by Mr. Fraser, said: 'Marriage is a contract *sui generis*, and differing in some respects from all other contracts, so that the rules of law which are applicable in expounding and enforcing other contracts may not apply to this. The contract of marriage is the most important of all human transactions. It is the very basis of the whole fabric of civilized society. The status of marriage is *juris gentium*, and the foundation of it, like that of all other contracts, rests on the consent of parties; but it differs from other contracts in this; that the rights, obligations, or duties arising from it are not left entirely to be regulated by the agreements of parties, but are, to a certain extent, matters of municipal regulation, over which the parties have no control by any declaration of their will. * * * '" Id., section 24. Lord Bannatyne said: "The rights arising from the relation of husband and wife, though taking their origin in contract, have yet, in all countries, a legal character, determined by their particular laws and usages, altogether independent of the terms of the contract, or the will of the parties at the time of entering into it." Id., section 25. "Robertson, C. J., said in a Kentucky case: 'Marriage, though in one sense a contract—because, being both stipulatory and consensual, it can not be valid without the spontaneous concurrence of two competent minds— is nevertheless *sui generis*, and, unlike ordinary or commercial contracts, is *publici juris*, because it establishes fundamental and most important domestic relations. And therefore, as every well-organized society is essentially

Rose, etc. v. Rose, etc.

interested in the existence and harmony and decorum of all its social relations, marriage, the most elementary and useful of them all, is regulated and controlled by the sovereign power of the State, and can not, like mere contracts, be dissolved by the mutual consent only of the contracting parties, but may be abrogated by the sovereign will, either with or without the consent of both parties, whenever the public good, or justice to both or either of the parties, will be thereby subserved. Such a remedial and conservative power is inherent in every independent nation, and can not be surrendered, or subjected to political restraint or foreign control, consistently with the public welfare. And therefore marriage, being much more than a contract, and depending essentially on the sovereign will, is not, as we presume, embraced by the constitutional interdiction of legislative acts impairing the obligation of contracts. The obligation is created by the public law, subject to the public will, and not to that of the parties.'" Id., section 30. Said Story in his Conflict of Laws: "It is rather to be deemed an institution of society, founded upon the consent and contract of the parties; and, in this view, it has some peculiarities, in its nature, character, operation and extent of obligation, different from what belong to ordinary contracts." Again: "Marriage is not a mere contract between the parties, subject, as to its continuance, dissolution, and effects, to their mere pleasure and intentions. But it is treated as a civil institution, the most interesting and important in its nature of any in society." Id., section 33. "Thus, to say that marriage is a contract, when speaking of the marital condition, not of the agreement to assume it, is, as we have seen, according even to the former utterances of most legal persons, inaccurate; since they further declare

that it differs in many particulars from other contracts.
And, when the differences are pointed out, we see that
they have covered every quality of the marriage, and left
nothing of contract.   All is submerged in the status."   Id.,
section 36.   Said Chief Justice Ames in Ditson v. Ditson,
4 R. I. 87:   "It [the State] may, except so far as checked
by Constitution or treaty, create by law new rights in,
or impose new duties upon, the parties to these relations,
or lessen both rights and duties, or abrogate them, and so
the legal obligation of the relation which involves them,
altogether.   This it may do, with the exception above
stated, as to some relations, by *law*, when it wills, de-
claring that the legal relation of master and slave, for in-
stance, shall cease to exist within its jurisdiction, or for
what causes or breaches of duty in the relation this, or
the legal relation of husband and wife or of parent and
child, may be restricted in their rights and duties, or
altogether dissolved, through the judicial intervention of
its courts."

Sufficient quotations have been given—and they might
be multiplied—to make plain the general underlying doc-
trine upon this subject.   The Kentucky cases bearing upon
this question will next be considered.

The case of Maguire v. Maguire, 7 Dana, 184, has been
already quoted from.   In that case the question was as
to the power of the Circuit Court, under the statute of
1809, to decree a divorce   *in invitum*   against a husband
who was never domiciled in Kentucky.   In his argument of
the question, Chief Justice Robertson was of opinion that,
"so far as a dissolution of a marriage by public authority
may be for the public good, it may be the exercise of a
legislative function; but so far as it may be for the ben-
efit of one of the parties, in consequence of a breach of

Rose, etc. v. Rose, etc.

the contract by the other, it is undoubtedly judicial." The distinction was drawn with reference to the Kentucky Constitution, under which the Legislature could not exercise any power clearly and purely judicial, and deserves attention as recognizing the legislative power of absolute dissolution of marriage, even by private act, when the object aimed at by the lawmaking power might be the public good.

In Berthelemy v. Johnson, 3 B. Mon. 90, Chief Justice Robertson emphasized the distinction referred to in the Maguire case between the functions delegated by the Constitution to the judiciary and prohibited to the Legislature, and held that the Legislature might constitutionally authorize the courts to grant divorces, on the ascertainment by them that the marriage obligations had been violated. This was under a special act of the Legislature enacted subsequently to the violation for which the divorce was authorized to be granted—a mode of procedure which has frequently been held constitutional by the courts of other States.

In Gaines v. Gaines, 9 B. Mon. 295, it appeared that Gaines and his wife had separated, with an agreement between Gaines and certain trustees for his wife, to which she was not a party, whereby certain provision was made for her. Some five years afterwards she instituted a suit for divorce, to which he filed a cross bill alleging five years' abandonment. By supplementary answer to the bill he pleaded that since the filing of his original answer the Legislature, by an act regularly and legally passed, after due notice to the wife, had divorced him, and she was no longer his wife. Nothing further was done in the suit until after his death, when the wife filed a bill of revivor, claiming arrearages of alimony, as well as dower

·and widow's distributive share.   The court, through Chief,
·Justice Marshall, in passing upon the constitutionality of
the special act, referred to the distinction drawn in Ma-
guire v. Maguire and Berthelemy v. Johnson, *supra*, be-
tween the legislative power of divorce for the benefit of
the public, and the judicial nature of divorces granted for
the benefit of the parties, and remarked upon the char-
acteristic feature of constitutional government in Ken-
tucky, "in which the departments of power are not only
carefully distinguished and divided, but the depositories
of power in each department are prohibited from exer-
cising, except in cases expressly authorized, any power
properly belonging to the others.   Can it be consistent
with this division and prohibition," asks the court, "that
after one department, erected for the very purpose of as-
certaining and enforcing existing rights according to ex-
isting laws, had obtained possession of the case, and juris-
diction over the parties and their rights, by a suit regu-
larly before it in a form and for purposes authorized by
law, another department, not intrusted with the func-
tion of deciding upon individual rights as founded in ex-
isting laws, prohibited from exercising judicial power, ex-
cept in a few instances not embracing this, prohibited
from passing any law impairing contracts or their obli-
gations, prohibited from taking private property for pub-
lic use, and having no pretext of a right to take it from
A. and give it to B., may, upon the application of one
·of the parties, take the case from the appointed and
selected forum, and by its mere *fiat* put an end, not only
to the contest as existing in the judicial tribunal, but to
the right itself, for the enforcement of which the party
alleging injury had appealed to the tribunal appointed by
the Constitution and the law for the ascertainment of

Rose, etc. v. Rose, etc.

private rights and the redress of private wrongs?" Pages 300, 301. After arguing that the power under discussion would imply the further power to nullify by special act a judgment already decreed between the parties,—in effect, power of reversal by the Legislature of judicial decrees —and after considerable argument upon the failure of the evidence before the Legislature to establish any grounds of divorce in favor of the man, and the evident purpose, by resorting to the Legislature, to defeat the wife's claim to provision out of his estate, which would inevitably have been granted in the pending suit, the court thus stated the question for decision: "The question, as thus developed by an analysis of the case, is not simply whether the Legislature may, under any circumstances, constitutionally enact that A. be divorced from B., but whether, when it is manifest that a party, after having sought a divorce in a judicial tribunal, and while his suit is there pending, abandons that forum, and resorts to the legislative power, for the sole purpose of affecting and defeating the legal and equitable rights of his wife in his property, the divorce granted by the Legislature on such application can, without disregarding the division of powers and distinction of departments as established by the Constitution, and the security of private rights of contract and of property therein granted, be considered as asserting to any extent the rights of property involved in the question of divorce. We are of opinion that it can not." And again the question decided is stated: "The power of prescribing by general laws what causes shall constitute sufficient ground for a divorce, and what shall be the consequences of a divorce founded upon the ascertainment of these causes, is strictly within the legislative competency, and its exercise is intrusted to the

legislative discretion. But the power of deciding upon
the existence of these causes in individual cases, and of
pronouncing the divorce and enforcing its legal conse-
quences, is strictly judicial." There are some expres-
sions in the opinion indicating that to some extent the
court, in argument, based its conclusion upon the theory
that, whatever power the Legislature might have over the
question of divorce by special act, it could not change the
right of private property "by a special act of divorce,
sought by one of the parties against the consent of the
other, with the purpose or effect of operating upon the
rights of property incident to the marriage relation, as
created and sustained by the general laws applicable to
that relation." But I am unable to conclude that by
this opinion it was intended to deny the legislative power
over the institution of marriage. But, if it be true that ·
in the case last referred to a disposition was shown to
limit the broad doctrine laid down in the Maguire case,
an equal disposition was shown in a subsequent case to
restrict that limitation. In Cabell v. Cabell's Admr., 1
Metc. (Ky.) 319, the husband and wife separated by mu-
tual consent. By the terms of the separation, she was
to be furnished with a riding horse and the sum of
$1,000; and it was agreed in writing that either or both
might apply to the Legislature for a divorce, and that
it might be granted without making further provision for
the wife's support. Upon the husband's petition to the
Legislature, setting forth the facts, it was enacted that
the marriage should be dissolved, and that they should
be restored "to all the rights and privileges of unmarried
persons." After Cabell's death, Mrs. Cabell claimed
dower, upon the ground that the legislative divorce was
unconstitutional and void, as—First, impairing the obli-

Rose, etc. v. Rose, etc.

gation of a contract, and therefore in violation of both
federal and State Constitutions; and, second, as being
an exercise of judicial power by the Legislature. This
court (Judge Stites delivering the opinion) disposed of
the first objection, viz., that the legislative divorce im-
paired the obligation of a contract, as follows: "It has
generally been considered by the courts of this country
—federal and State—that marriage, though in some re-
spects a contract, is not within the constitutional inter-
diction of legislative acts impairing the obligation of
contracts. In Dartmouth College v. Woodward, 4 Wheat.
518, Chief Justice Marshall observed that the Constitu-
tion of the United States had never been understood to
restrict the general right of the Legislatures of the States
to legislate on the subject of divorces. And a similar
view seems to have been entertained by Judge Story in
the same case. This doctrine seems likewise to have
been acquiesced in by Chancellor Kent, who concedes
'that in ordinary cases the constitutionality of the laws
of divorce in the respective States is not to be ques-
tioned.' 2 Kent, Comm. 108. So, in Connecticut, it was
held that legislative divorces for cause were constitu-
tional and valid. Starr v. Pease, 8 Conn. 541. We are
aware of no case in Kentucky in which this question has
been directly raised or decided; but the general doctrine
that the marriage contract is not within the constitutional
inhibition has been certainly approved by this court im-
pliedly, if not directly." After referring to Maguire v.
Maguire and Berthelemy v. Johnson, *supra*, the opinion
states what was considered to be the effect of Gaines v.
Gaines: "And in Gaines v. Gaines, 9 B. Mon. 308, in
which it was held the Legislature could not, by special

[5]

act of divorce, sought by one of the parties against the consent of the other, affect prejudicially the rights of property of the latter growing out of, and incident to, the marriage relation, the general power of the Legislature over the subject of divorces and the contract of marriage is not only not questioned, but is virtually conceded. In addition to these almost direct judicial recognitions of the power of the Legislature, to some extent, over the marriage relation and contract, and the rights of the parties incident thereto, and in corroboration of the correctness of the doctrine that the power exists, we have had frequent and repeated instances of its exercise under the Constitution of 1799, acquiesced in by the executive, and, except in the cases referred to, never called in question. Every department of government in this State, since the adoption of the Constitution of 1799, and up to 1850, seems to have recognized the marriage relation, as has been said, as an organic institution, subject to the sovereign power of the State, not, like mere contracts, to be dissolved by the mutual consent only of the contracting parties, but to be abrogated by the sovereign will, either with or without the consent of both parties, whenever the public good, or justice to both or either of the parties, will be thereby subserved,' and to have regarded 'the obligation as created by the public law, subject to the public will, and not to that of the parties.' " That part of the opinion in Cabell v. Cabell's Admr. which argues that the facts did not come within the rule laid down in the Gaines case, as showing an exercise of judicial power by the Legislature, sheds no light on the present question, and need not be here considered.

The doctrine to be deduced from these cases is that

the marriage status, or relation existing between hus-
band and wife, is, with all its attending rights, subject to
the sovereign power of the State.   The relation may be
entirely abrogated,   and  every  resultant  right  de-
stroyed,  together  with   the  relation  from  which
it sprung.  This may be done upon proof being made of
ground for divorce which occurred prior to the enactment
of the law which made it such ground.   This is upon the
ground that the marriage relation and  its  attendant
rights are not included in the provision of the State or
federal Constitution as to laws impairing the obligation
of contracts.  If they were included in such provision,
then it would follow necessarily that, whenever a married
couple might go, they would take with them the law of
the place where the marriage was contracted, as written
into the marriage contract.  If they sought divorce in
another jurisdiction, it would be necessary to prove the
law existent at the time the marriage was entered into
in the place where it was contracted.  And so, wherever
they went, they would be governed in their relation to
one another by such law, both as to their respective
rights and duties, and as to their property rights, not-
withstanding they might be domiciled in the new juris-
diction immediately after the marriage was consummated
and remain so domiciled until their death.  It would fol-
low necessarily that the act of 1846, which took from the
husband his estate of freehold during the joint lives of
husband and wife, which attached to him upon marriage,
and gave him in lieu thereof merely the use of the wife's
land, with power to rent it for not more than three years
at a time, and made the husband's rights not subject
to his debts, was unconstitutional, both as to the hus-
band and as to creditors.    No such doctrine has ever

been announced, nor, so far as I am informed, been con-
tended for. It would follow, also, that the act authoriz-
ing a Circuit Court to empower a married woman to act
as a *feme sole* was unconstitutional.     But, as said by
Judge Stites in the Cabell case, every department of the
State government seems to have regarded the marital
relation as created by the public law, subject to the public
will, and not to that of the parties. The *vinculum* of
the marriage may be broken, therefore, either by direct
statutory action, or under statutory authority given to
the courts; and this may be done for causes antecedent to
the statute.    Carson v. Carson, 40 Miss. 349; Berthelemy
v. Johnson, 3 B. Mon. 90; West v. West, 2 Mass. 223; Bige-
low v. Bigelow, 108 Mass. 38.    If the foundation of the
rights may be taken away, with the result of the absolute
destruction of such rights in all property which has not
been lawfully consumed or disposed of during the exist-
ence of the marriage, why can not the rights themselves
be altered or modified or taken away without the disso-
lution of the marriage itself? What peculiar sanctity
attaches to a marital right which does not belong to the
institution of marriage?    Does not the greater power in-
clude the less?    Is not the whole greater than any of its
parts?

There are, it is true, a large number of cases, and num-
berless dicta, which either state or imply a distinction be-
tween the marriage status and the rights of property
which accrue under it.    These may be found collated in
2 Bish. Mar. Wom., sections 38-51, and in the note to
McNeer v. McNeer (Ill. Sup.) 19 Lawy. Rep. Ann. 256 (s. c. 32
N. E. 681.) It may be remarked that the New York decisions
upon the subject of marriage are not in accord with those
of most civilized countries; it being there held that a

divorce obtained in another State against a citizen of
New York did not release the latter from the marriage
bond, though perfectly valid in the State which granted
it, and that a subsequent marriage of the man, who, it
was admitted, had ceased to have a wife, was polygamy
under the laws of New York.  Baker v. People, 15 Hun.
256.  And it is there held that divorce obtained by the
wife does not bar dower.  A distinction is also drawn
in the cases between the various kinds of marital rights,
by dividing them into vested and non-vested rights.  The
preponderance of the decisions is to the effect that both
curtesy and dower are not vested rights, though it is
difficult to see upon what reason the distinction is found-
ed.  A married woman has a present, fixed capacity and
right of future enjoyment of an estate for life of one-
third of the lands of which her husband is seised.  It is
urged with some plausibility that it can not be known,
until her dower is assigned, exactly what property will
be assigned to her; but her right to one-third of what her
husband is seised of is fixed.  So of curtesy.  It is
claimed that it does not take effect until after the death
of the wife.  According to the common-law rule, this
reasoning is not sound, and is stated to be unsound by
Mr. Bishop; for upon the birth of the child the husband
becomes tenant by the curtesy initiate.     2 Bish. Mar.
Wom., section 43.  An estate is none the less vested be-
cause it is not in possession.  But a tenancy by the cur-
tesy initiate is an estate in possession.  Upon the birth
of the child, the husband's freehold estate by the marital
right becomes extended, and merged into a tenancy by
the curtesy initiate, under which he holds the land, even
during the life of the wife.  And yet the author of the
note to McNeer v. McNeer (Ill. Sup.) 19 Lawy. Rep. Ann.

258 (s. c. 32 N. E. 681, states that he has "been unable to find any case where the power of the Legislature to defeat the right of curtesy initiate has been denied, except where the husband's right, which was held to be vested, and, beyond the power of the Legislature to destroy, consisted in whole or in part of his present right to the possession and profits of the wife's estate during coverture." And so of the husband's right to the wife's choses in action. He has a right to bring suit for, recover, and reduce them to possession. They then become his. And yet it is said that he has not a vested right to them, because, if he does not exercise the right, it survives to the wife, and does not pass to his executor. For what other thing has a man a present, fixed right to bring suit and obtain recovery, to which he has not a vested right? Wherein is the husband's freehold by the marital right more a vested right than his right to sue for his wife's choses in action? And yet an act taking away the husband's right to recover the wife's choses in action is not unconstitutional. Percy v. Cockrill [4 C. C. A. 73], 53 Fed. 872. It is not claimed that any part of the wife's property which had been lawfully consumed or lawfully disposed of during the continuance of the marriage relation, or before any statutory interference with the husband's rights, would be affected by a statute like the one under consideration; but it is insisted that, as between the husband and wife, all the rights growing out of the marital status are subject to the sovereign will.

In Rugh v. Ottenheimer, 6 Or. 231 [25 Am. R., 513], the plaintiff (appellant) was a married woman at the time of the adoption of the State Constitution. Judge Boise, delivering the opinion, states the question as follows: "The deed from Sebastion to plaintiff did not limit the land to her use, and

the evidence does not show that in her trade with Gardner such a limitation was to be inserted in the deed. And, if the rule of the common law is not abrogated or modified by the State Constitution, then W. C. Rugh had an interest in this land which was liable to execution for his debts. It becomes, therefore, necessary to consider how far the real estate of women who were married at the time Oregon became a State was affected by section 5, art. 15, of the State Constitution. This section provides: "The property and pecuniary rights of every married woman at the time of marriage or afterwards, acquired by gift, devise or inheritance, shall not be subject to the debts or contracts of the husband.'" After deciding that the clause of the Constitution was not merely prospective, and applicable only to future marriages, or property acquired after the establishment of the State government, the court continued: "So the only real objection is that this section defeats or modifies the rights of the husband in his wife's property. Courts look with disfavor on all laws which are retrospective in their action, where they devest vested estates, or impair the obligation of contracts. It was by virtue of the marriage contract that the husband became, at common law, entitled to the use of his wife's land. And it was a fiction of the common law that husband and wife were one person, and the legal rights of the wife, on marriage, became merged in the husband; but this fiction, and the laws and decisions which grew up under it, were becoming modified in this country before the adoption of our Constitution—the more rational and enlightened maxims of the civil law, which recognized the rights of married women to property, having then been adopted in many of the States. And, where the civil law was not adopted, cautious and judicious pa-

rents evaded the rigid rules of the common law by making ante-marital settlements for the benefit of future wives. If the section of the Constitution under consideration, which changes the common-law rights of the husband, is right and proper in cases of future marriages, or of property acquired in future, it is also right and proper to apply it to the lands of persons then married, unless such a construction can not be given it.    Against such a construction, it is claimed that the husband by the common law, became, on marriage, invested with a freehold in the lands of the wife, which estate continued for their joint lives.    This estate, however, was conditional, and subject to be defeated by a divorce *a vinculo*.    Schouler, Dom. Rel. 300.    The marriage contract out of which this estate arose was at common law one in which the State was interested, and over which it exercised legislative control. It is both *sui generis* and *publici juris*.    Cord, Rights of Married Women, 1 Kent, Comm. 418, note a; Maguire v. Maguire, 7 Dana, 183.    In this last case the court, in speaking of the legislative control over marriage contracts, says: 'Marriage, being much more than a contract, and depending essentially on the sovereign will, is not, as we presume, embraced by the constitutional interdiction of legislative acts impairing the obligations of contracts.'    In view, therefore, of the nature of the contract by which the estate of the husband in his wife's hands is created, and the control which the Legislature has always assumed over them, we think that without constitutional authority such contracts are subject to be altered and modified by the Legislature.    But this section of the Constitution is an expression of the sovereign will of the people, expressed in their Constitution; and in the making of that Constitution the convention represented the sov-

Rose, etc. v. Rose, etc.

ereign power, and was subject to the control of no higher power, except the Constitution of the United States; and, if they judged it right to exempt the lands of married women from the debts and contracts of their husbands, they could do so; and the only question is, what is the true meaning and scope of the section of the Constitution in question?" In this case the court held that the construction given was not controlled or affected by another provision of the Constitution, that "private rights shall not be affected by such changes." And upon this question the court continued: "The marriage relation, affecting the whole public, and being an institution of society, affecting more deeply than any other the foundations of social order and public morals, has always been under the control of the Legislature. The Legislature can, and often does, dissolve the marriage relation between parties; and when the relation is thus destroyed the marital right to use the wife's land, which is incident to such relation, ceases longer to exist. And we think this right is not strictly a private right, but one which is incident to a relation in which the whole community is interested. We think, therefore, that section 5, art. 15, is not modified by section 10, art. 18, of the Constitution, and that article 5, section 15, does include all the lands owned in their own right by married women at the time of marriage—whether married before or after Oregon became a State."

We have seen that the Legislature of Kentucky has twice modified the life estate by the marital right—once by direct statutory action, and once by statute to be made effectual through the medium of the courts, by authorizing them to enter decrees clothing married women with the powers of a *feme sole*. No question has ever been made

as to the constitutionality of either statute. On the other hand, it has been held in Azbill v. Azbill, 92 Ky. 154 [17 S. W. 284], that a decree authorizing a married woman to act as a *feme sole* may be entered against the objection of the husband, and after a contest made by him against it in the courts. The opinion in this case, by Judge Lewis, shows one of the grounds of the application to be the wife's ownership of personal property, which of course had vested in the husband by virtue of the marriage, and of land, in which a freehold estate by the marital right had vested in him. Does not this decree take away his vested rights, if any right is vested, under the Constitution which springs out of, or takes its origin from, the marriage relation? If authorized by such a decree, the wife may by will defeat her husband's right of curtesy. Garner v. Wills, 92 Ky. 386 [17 S. W. 1023.] It is conceded that, if we are to be guided by the mere number of cases which have been decided upon this question, the husband's contention must prevail. But if we are to reach our conclusion by reasoning from the nature of the marriage relation, and the principles which underlie it, it must be decided in favor of the wife. It has appeared to me so plain, from a careful reading of the statute, that it was intended to be applied to existing marriages and property held thereunder, that I have not discussed the question, which, indeed, appears to be conceded in the arguments of counsel. Great difference of opinion may exist as to the policy of the statute in question. Many have doubted the wisdom of the enactments giving to married women greater freedom of contract and disposition of their property. Since the enactment of the statute, cases have arisen which furnish strong argument in favor of the view that it was unwise to take from the wife the re-

straints which, for her protection, the common law had woven about her. That, however, is a matter for the discretion of the Legislature. But I have never had a doubt of the wisdom of the particular provision now under consideration. It has seemed to me monstrous that a brutal husband should have the legal right to put his wife to the election of either leaving him in possession of all her estate, or assuming the social stigma of a divorced woman, and that, having the use of her land, he should have the right there to entertain such guests as he saw fit, against her protest. It is unprofitable, however, to discuss the wisdom of the act. It has been adopted. My conclusion is that it was intended to take effect at once, as to all property held by virtue of existing or future marriages, except as to such as had been theretofore lawfully consumed or disposed of, and further, that it is not in conflict with the Constitution, for the reason that all rights obtained by virtue of the status of marriage are taken subject to the sovereign power of the State to alter and modify them. In my opinion, the judgment should be reversed.

Judge Hazelrigg dissenting.

·Our statutes conferred on the husband, during the wife's life, no estate or interest in her lands, except an uncertain and contingent use thereof, with power to rent them for not more than three years at a time; and even this rent went to the wife if the husband died during the term. If the wife happened not to avail herself of her statutory right to incumber her estate for debts created for necessaries for herself or for any member of her family, including her husband, and also happened not to avail herself (as she might, even in opposition to the husband's will) of the sweeping rights with which she may invest herself

under the statute empowering her to act as a single woman, then the husband might enjoy the use of her lands. It is a stretch of legal nomenclature to call this an estate or interest in lands at all, and a clear confusion of terms to call such uncertain and contingent interest a vested estate or interest. The husband can not sell this use, nor can his creditors subject it to their debts, contracted either before or during his marriage. The argument of the cases relied on in the majority opinion finds its chief support in the recited fact that the husband's interest in the wife's lands may be sold or otherwise disposed of by him, or by his creditors. "It can not be," said the court, in McNeer v. McNeer (Ill. Sup.) 19 Lawy Rep. Ann. 260 (s. c. 32 N. E. 682), "that an interest in property, which can be seized on execution and sold by creditors in payment of their debts, is not such a vested interest as the fundamental law will protect from destruction by retroactive legislation." But, speaking of the modification of the old law by the Illinois statutes, the court said further: "So long as she lived, however, his interest in her land *lacked those elements of property, such as the power of disposition and liabilty to sale under execution, which had formerly given it the character of a vested estate.*" Mr. Cooley, in speaking of the husband's common-law right of curtesy initiate, says: "This right would be property subject to conveyance, and be taken for debts, and *therefore* must be regarded as a vested right, no more subject to legislative interference than other expectant interests which have ceased to be such contingencies and become fixed." Const. Lim. (6th Ed.) p. 440. I may take occasion, when time permits, to extend these views. I do not believe any case can be found holding

such a restricted, shadowy, and uncertain use as is given the husband in his wife's lands under the Kentucky statutes in force when the parties to this marriage entered into that relation to be a vested estate or interest in lands.

Judge Burnam concurs.

