NANCY C. RUGH, Respondent, *v.* SAMUEL OTTEN-HEIMER, Appellant.

MARRIED WOMEN—EXEMPTION IN FAVOR OF.—Section 5, article 15 of the constitution of this state, exempts from execution for the husband's debts, the lands of a married woman, who was married before the adoption of the state constitution.

CONSTRUCTION.—In construing different parts of the constitution, effect should be given to all the words.

MARRIAGE CONTRACT.—Marriage is a contract *sui generis* and *juris publici*, and is not subject to the constitutional inhibition of legislative acts impairing the obligation of contracts.

ESTOPPEL—PLEADING.—An estoppel, to be relied on as a defense, should be pleaded.

APPEAL from Baker County.

The facts are stated in the opinion of the court.

*I. D. Hains, Jas. H. Slater and E. A. Cronin,* for appellant.

*Sterns and Lichtenthaler,* for respondent.

By the Court, BOISE, J.:

This suit is in the nature of a cross-bill to an action of ejectment. It is claimed in the complaint that on the eleventh day of October, 1857, the plaintiff was married to

one William C. Rugh, whose wife she now is; 2. That on the * * day of August, 1856, the plaintiff, then a *feme sole*, purchased of one Daniel Sebastion a farm of one hundred and sixty acres of land situated in Washington county in this state; 3. That about the first day of March, 1869, plaintiff made a contract with one Nelson Gardner, whereby it was agreed that said land in Washington county should be exchanged for the land in controversy in this suit.

That in pursuance of said agreement to exchange lands this plaintiff, on the twenty-ninth day of March, executed to said Nelson Gardner a deed in due form of law, conveying said land in Washington county to him. And then demanded of him a deed to herself of the land in controversy. But that said Gardner refused to execute to her said deed, but executed the same to her husband, W. C. Rugh. Plaintiff alleges that with her said husband she went on to the land in controversy, and that her husband soon after the execution promised to deed said land to her, but neglected to do so, and finally refused to so deed it. From these facts she claims that the land in controversy was her separate property. These allegations, except as to the marriage, are denied by the answer. There are other issues raised as to the title of the defendant, who claims under a sheriff's deed based on an execution and judgment against W. C. Rugh, the husband of the plaintiff, but the questions presented on the issues above stated were the basis of the decree of the circuit court, and are all the issues which it will be necessary to examine in coming to a conclusion in this court.

From the testimony reported in this suit it appears that the plaintiff at the time she purchased the land of Sebastion in Washington county was a single woman, and paid for it with her own money, but the deed was not executed and delivered to her until January, 1858, after her marriage with W. C. Rugh. It further appears from the testimony that she lived on this land in Washington county, with her husband until she traded it to Gardner in 1869. The weight of the testimony shows that she negotiated the trade with Gardner, though her husband assisted, and that

Gardner afterwards agreed to execute a deed to her. After this exchange of farms was made she and her husband moved on to the land in controversy and made their home there. That about March, 1873, said W. C. Rugh, the husband of plaintiff, left the state, and has not resided with her since that time. It is claimed that the evidence shows that the money with which the plaintiff purchased the land in Washington county was the proceeds of the sale of a donation land claim, which she formerly owned in Washington Territory.

It seems to us that it is immaterial where this money came from. She was then a *feme sole,* and could do as she pleased with her money, and the source from which the money was derived would not affect the rights of her future husband. The deed was given to her, and whatever interest W. C. Rugh, the husband, acquired to this land, was derived through his marital rights in his wife's land. That interest at common law was the right to enjoy the rents and profits during their joint lives, and the right of curtesy (in case of issue born alive) after her death. And on the marriage of plaintiff and W. C. Rugh, during our territorial government, the husband acquired the rights and profits of the land in Washington county, and such were the relations of plaintiff and her husband at the time of the adoption of our state constitution. And had this relation continued after the adoption of the state constitution, and until the exchange of this land for the land in question, the same right would have attached to the land in question had the same been conveyed to plaintiff, unless some words in the deed had limited it to her separate use.

The deed from Sebastion to plaintiff did not limit the land to her use, and the evidence does not show that in her trade with Gardner such a limitation was to be inserted in the deed. And if the rule of the common law is not abrogated or modified by the state constitution, then W. C. Rugh had an interest in this land which was liable to execution for his debts. It becomes therefore necessary to consider how far the real estate of women who were married at the time Oregon became a state, was affected by section 5,

article 15 of the state constitution. This section provides: "The property and pecuniary rights of every married woman at the time of marriage or afterwards, acquired by gift, devise or inheritance, shall not be subject to the debts or contracts of the husband."

It is claimed that this clause is only prospective and applies only to future marriages, or property acquired after the establishment of the state government, and that it should not be construed so as to divest husbands then married of their marital rights in the real estate of their wives. The simple natural construction of the words used in this section, read by scholars unrestrained by legal technicalities or rules of construction of statutes, would include the property and pecuniary rights of married women who were then married and owning property which could be made subject to this provision. It did not refer exclusively to property then separate property and already secured to them, for that would have accomplished nothing in favor of married women whose status as to property was intended to be affected. It is contended that the words property and pecuniary rights of every married woman at the time of marriage, refer only to future marriages, for the marital rights of husbands then married were already vested and could not be changed, while rights by gift, devise and inheritance could come to women then married and be protected. Such is not the natural and obvious meaning of the section. The plain meaning of the section is that it applies in all its force to women then married, and protects their lands and their property from the debts and contracts of the husband, and such should be the construction given to it, unless we are compelled to restrain its full import to protect the marital rights of the husbands then married. It is a rule in construing constitutions and statutes that we look at the circumstances which surrounded the law given at the time it was enacted, and ascertain, if we can, the object of the law and the right to be protected.

The members of the constitutional convention were mostly farmers, who had acquired land under the act of congress of the twenty-seventh of September, 1850, granting land to

settlers in Oregon. When these settlers were married people, the wife received from the government an equal share of the land with her husband, and as there was a vast amount of this land, the title to which was in the married women of the county, a large majority of the members of the convention enacted this clause, supposing that it would protect this property from the debts and contracts of the husband, and they did not think it capable of any other construction.

And such has been the almost uniform construction of this section by the people of the state since that time, and the only reason that can be urged against such a construction, is that it modifies the marital rights of the husband in this land to his injury, and, as in this case, may prevent creditors of the husband from selling the marital rights of the husband. In the last case this provision could not be defeated, because it abridges the rights of creditors of the husband in securing their debts, for such a doctrine would defeat and render null all homestead exemption laws. So the only real objection is that this section defeats or modifies the rights of the husband in his wife's property. Courts look with disfavor on all laws which are retrospective in their action where they divest vested estates, or impair the obligation of contracts.

It was by virtue of the marriage contract that the husband became at common law, entitled to the use of his wife's land. And it was a fiction of the common law, that husband and wife were one person, and the legal rights of the wife on marriage become merged in the husband; but this fiction, and the laws and decisions which grew up under it, were becoming modified in this country before the adoption of our constitution, the more rational and enlightened maxims of the civil law, which recognizes the rights of married women to property, having then been adopted in many of the states. And where the civil law was not adopted, cautious and judicious parents evaded the rigid rules of the common law by making anti-marital settlements for the benefit of future wives. If the section of the constitution under consideration, which changes the common law rights

of the husband, is right and proper in cases of future marriages, or of property acquired in future, it is also right and proper to apply it to the lands of persons then married, unless such a construction cannot be given it. Against such a construction, it is claimed that the husband, by the common law, became on marriage invested with a freehold in the lands of the wife, which estate continued for their joint lives. This estate, however, was conditional and subject to be defeated by a divorce *a vinculo.* (Schoaler's Dom. Rel. 300.) The marriage contract out of which this estate arose, was at common law one in which the state was interested, and over which it exercised legislative control. It is both *sui generis* and *publici juris.* (Cord on R. of M. W., 1 Kent, 418, note a; *Maguire* v. *Maguire,* 7 Dana Ky. 183.)

In this last case the court, in speaking of the legislative control over marriage contracts, says: "Marriage being much more than a contract, and depending essentially on the sovereign will, is not, as we presume, embraced by the constitutional interdiction of legislative acts impairing the obligations of contracts." In view therefore of the nature of the contract by which the estate of the husband in his wife's lands is created, and the control which the legislature has always assumed over them, we think that without constitutional authority such contracts are subject to be altered and modified by the legislature. But this section of the constitution is an expression of the sovereign will of the people expressed in their constitution, and in the making of that constitution the convention represented the sovereign power, and was subject to the control of no higher power, except the constitution of the United States, and if they judged it right to exempt the lands of married women from the debts and contracts of these husbands, they could do so, and the only question is, What is the true meaning and scope of the section of the constitution in question? As we have before indicated, the language of the section embraces the lands of women who were married at the time Oregon became a state; and such meaning should be given to it, unless it be limited by the last clause of section 10 of article 18 (schedule)

of the constitution, which is: "And private rights shall not be affected by such changes."

In construing these two clauses of the constitution the obvious meaning and intent of both should be given effect if possible. They are in *pari materia*, and must be construed together. The words "private rights" may properly be confined to such rights, when applied to property, as persons may possess unconnected with, and not essentially affecting, the public interest, or growing out of a public institution of society.

The marriage relation, affecting the whole public, and being an institution of society affecting more deeply than any other the foundations of social order and public morals, has always been under the control of the legislature. The legislature can, and often does, dissolve the marriage relation between parties, and when the relation is thus destroyed the marital right to use the wife's land, which is incident to such relation, ceases longer to exist. And we think this right is not strictly a private right, but is one which is incident to a relation in which the whole community is interested. We think, therefore, that section 5, article 15, is not modified by section 10, article 18 of the constitution, and that article 5, section 15, does include all the lands owned in their own right by married women at the time of marriage, whether married before or after Oregon became a state.

It is claimed as a further defense in this case that the plaintiff is estopped from claiming this land, as she acquiesced in giving the deed to her husband by Gardner, and that it is a fraud for her to now claim the land against the creditors of her husband, who furnished the goods on the faith that he was the owner of this land. So far as this matter is concerned, we think from the evidence and the law in this case that the plaintiff has an equity in this case, and which she could enforce against her husband, although the trust was not by deed. As the land in Washington county was her property, a court of equity will follow it into this land, unless she has voluntarily surrendered it. (*Nichlin* v. *Wythe*, 2 Sawyer, 535; 64 N. C. 538.) And we find

from the evidence that she did not surrender it.   If she has been guilty of fraud which should estop her, then the same should be pleaded to make it allowable, which is not done, and the matter of estoppel cannot be considered in this case.

We have considered all the questions necessary for the determination of this case, and think the decree of the court below should be affirmed.