Argued and submitted December 15, 2004, judgment of circuit court reversed,
and case remanded to circuit court with instructions to dismiss the action
April 14, 2005

Mary LI
and Rebecca Kennedy;
Stephen Knox, M.D., and Eric Warshaw, M.D.;
Kelly Burke and Dolores Doyle;
Donna Potter and Pamela Moen;
Dominick Vetri and Douglas Dewitt;
Sally Sheklow and Enid Lefton;
Irene Farrera and Nina Korican;
Walter Frankel and Curtis Keifer;
Julie Williams and Coleen Belisle;
Basic Rights Oregon;
and American Civil Liberties Union of Oregon,
*Respondents,*
*Cross-Appellants,*

*and*

MULTNOMAH COUNTY,
*Respondent,*
*Cross-Appellant,*

*v.*

STATE OF OREGON;
Theodore Kulongoski, in his official capacity as
Governor of the State of Oregon;
Hardy Myers, in his official capacity as
Attorney General of the State of Oregon;
Gary Weeks, in his official capacity as Director of the
Department of Human Services of the State of Oregon;
and Jennifer Woodward, in her official capacity as
State Registrar of the State of Oregon,
*Appellants,*
*Cross-Respondents,*

*and*

DEFENSE OF MARRIAGE COALITION,
Cecil Michael Thomas, Nancy Jo Thomas, Dan Mates,
and Dick Jordan Osborne,
*Appellants,*
*Cross-Respondents.*

(CC 0403-03057; CA A124877; SC S51612)

110 P3d 91

Michael C. Livingston, Assistant Attorney General, Salem, argued the cause and filed the briefs for appellants, cross-respondents State of Oregon et al. With him on the briefs were Hardy Myers, Attorney General, and Peter Shepherd, Deputy Attorney General.

Kelly Clark, of O'Donnell & Clark, LLP, Portland, argued the cause and filed the briefs for appellants, cross-respondents Defense of Marriage Coalition et al. With him on the briefs were Kristian Roggendorf, Portland, Herbert G. Gray, Beaverton, Kelly E. Ford, of Kelly E. Ford, P.C., Beaverton, Kevin Clarkson, of Brena Bell & Clarkson, Anchorage, Alaska, Benjamin W. Bull and Jordan Lorence, of Alliance Defense Fund, Scottsdale, Arizona, Raymond M. Cihak and Pamela S. Hediger, of Evashevski Elliott Cihak & Hediger, Corvallis.

Kenneth Y. Choe, *pro hac vice*, American Civil Liberties Union Foundation, New York, argued the cause for respondents, cross-appellants Mary Li et al. Lynn R. Nakamoto, of Markowitz, Herbold, Glade & Mehlhaf, P.C., Portland, cooperating counsel for ACLU Foundation of Oregon, filed the briefs. With her on the briefs was Kenneth Y. Choe.

Jacqueline A. Webber, Assistant County Attorney, Multnomah County, Portland, argued the cause and filed the briefs for respondent, cross-appellant Multnomah County. With her on the briefs were Agnes Sowle, County Attorney, Multnomah County, Katie A. Lane, Assistant County Attorney, Multnomah County, and Christopher D. Crean, Assistant County Attorney, Multnomah County.

Barry Adamson, Lake Oswego, filed a brief *amicus curiae* for himself.

Joseph Wetzel, of Wetzel, DeFrang & Sandor, Portland, and Paul Benjamin Linton, Northbrook, Illinois, filed a brief for *amicus curiae* United Families International.

Melanie E. Mansell, Salem, and David R. Langdon, of Law & Liberty Institute, Cincinnati, Ohio, filed a brief for *amicus curiae* Family Research Council.

Daniel A. Hill, of Adams, Day & Hill, Salem, and Dwight G. Duncan, North Dartmouth, Massachusetts, filed a brief for *amicus curiae* Alliance for Marriage.

Mark Johnson, of Johnson Renshaw & Lechman-Su PC, Leslie Harris and Michael Moffitt, of the University of Oregon School of Law, Eugene, and Susan M. Murray and Beth Robinson, of Langrock Sperry & Wool, LLP, Burlington,

Vermont, filed a brief for *amici curiae* Vermont Freedom to Marry Task Force; Vermonters for Civil Unions Legislative Defense Fund; Pride at Work; AFL-CIO; Parents, Families and Friends of Lesbians and Gays (PFLAG); National Gay and Lesbian Task Force; The National Lesbian and Gay Law Association; Lambda Legal Defense and Education Fund, Inc. (Lambda Legal); National Black Justice Coalition; Heterosexuals for the Right of Gays and Lesbians to Marry; Human Rights Campaign Foundation; Gay and Lesbian Advocates and Defenders (GLAD); Freedom to Marry; Family Pride Coalition; and Asian Equality.

Randall J. Wolfe, P.C., Lake Oswego, Vincent P. McCarthy, Senior Regional Counsel and Kristina J. Wenberg, Staff Counsel, for American Center for Law & Justice, New Milford, Connecticut, John Tuskey, Senior Research Counsel, Shannon Woodruff, Associate Research Counsel, and Laura Hernandez Associate Research Counsel, Virginia Beach, Virginia, filed a brief for *amicus curiae* American Center for Law and Justice.

John F. Fagan, Sr., of PACNW Elder Law Office, LLC, The Dalles, filed a brief for *amicus curiae* Stronger Families for Oregon.

James N. Westwood, of Stoel Rives LLP, Portland, Pamela A. Harris, Toby J. Heytens, and Karl Michael Remon Thompson, of O'Melveny & Myers, LLP, Washington, D.C., filed a brief for *amici curiae* American Friends Service Committee; National Coalition of American Nuns; Unitarian Universalist Association; Alliance of Baptists; Joan L. Beck, Daniel E.H. Bryant, Barbara Carnegie Campbell, Karen Crooch, Tim Crump, David Dornack, Jan Fairchild, Maurice Harris, Marcia Hauer, David Isaiah Hedelman, Jeanne Knepper, Hector Lopez, Lynne Smouse Lopez, Karen McClintock, Casey Moffett-Chaney, Elizabeth Oettinger, Penny Senger Parsons, Christine Riley, Emanual Rose, Kim Rosen, Eugene Ross, Glenna T. Shepherd, Anthony C. Thurston, Tara Wilkins, Dana Worsnop, and Judith Youngman.

John Paul Graff and Katherine H. O'Neil, of Graff & O'Neill, Portland, and Ruth N. Borenstein, Sylvia M. Sokol, of Morrison & Foerster LLP, San Francisco, California, filed

a brief for *amici curiae* Doctors Richard S. Colman, Rodica N. Meyer, and Lorah Sebastian.

Edward J. Reeves, of Stoel Rives LLP, Portland, filed a brief for *amici curiae* The Juvenile Rights Project, Inc.; The National Association of Social Workers; The Oregon Chapter of the National Association of Social Workers; Open Adoption & Family Services, Inc.; The Oregon Psychiatric Association; and the Oregon Psychological Association.

Beth A. Allen, of Lane Powell Spears Lubersky LLP, Portland, filed a brief for *amici curiae* Oregon Gay and Lesbian Law Association; Equity Foundation, Inc.; Love Makes a Family, Inc.; Rural Organizing Project, Inc.; Cascade Aids Project; Parents and Friends of Lesbians and Gays, Oregon State Council; and Parents Friends of Lesbians and Gays, Portland Chapter.

Les Swanson, Portland, filed a brief for *amici curiae* Paula Abrams, Gilbert Paul Carrasco, Vincent Chiapetta, Garrett Epps, Steven K. Green, James Huffman, M.H. "Sam" Jacobson, Stephen Kanter, Susan F. Mandiberg, James M. O'Fallon, Margaret Paris, and Dean M. Richardson.

Maureen Leonard and Ellen Taussig Conaty, Portland, with the assistance of Honorable Betty Roberts, Portland, filed a brief for *amici curiae* Legal Momentum (formerly NOW Legal Defense and Education Fund); National Association of Women Lawyers; National Council of Jewish Women; National Organization for Women (NOW) Foundation, Women's Law Project, Northwest Women's Law Center, Naral Pro-Choice Oregon; Young Women's Christian Association (YWCA) of Salem; National Organization for Women (NOW), Oregon Chapter; League of Women Voters of Oregon; National Council of Jewish Women (NCJW), Portland Section; American Association of University Women (AAUW) of Oregon; and Oregon Trial Lawyers Association (OTLA).

Donna R. Meyer, of Fitzwater & Meyer, LLP, Clackamas, with the assistance of Paul M. Smith and William M. Hohengarten, of Jenner & Block LLP, Washington, D.C., and Nathalie F.P. Gilfoyle, of American Psychological

Association, Washington, D.C., filed a brief for *amici curiae* American Psychological Association.

Charles F. Hinkle, of Stoel Rives LLP, Portland, filed a brief for *amici curiae* Civil Rights and Historians.

James E. Leuenberger, Lake Oswego, and Mathew D. Staver, *pro hac vice*, Longwood, Florida, filed briefs for *amicus curiae* Liberty Counsel.

GILLETTE, J.

## GILLETTE, J.

The dispute underlying this declaratory judgment case began when the Chair of the Multnomah County Board of Commissioners ordered the Records Management Division of Multnomah County (the county)[1] to issue marriage licenses to same-sex couples who applied for such licenses from the county. Pursuant to those licenses, approximately 3,000 same-sex couples participated in individual marriage ceremonies conducted by various officials empowered under Oregon law to perform marriages. Those officials forwarded the documentation generated by each ceremony to the State Registrar, who maintains a central record of marriages performed in Oregon. The State Registrar, however, refused to register the documents on the ground that same-sex marriages do not comport with the provisions of ORS chapter 106, which regulates marriages performed in Oregon. As a result, the plaintiffs in this case—nine same-sex couples,[2] the advocacy group Basic Rights Oregon, the American Civil Liberties Union of Oregon, and the county (collectively, plaintiffs)—brought this action against the State of Oregon, the Governor, the Attorney General, the Director of the Department of Human Services, and the State Registrar (collectively, the state) seeking a declaration that the statutes prohibiting same-sex couples from marrying on the same terms as opposite-sex couples violated Article I, section 20, of the Oregon Constitution.[3]

On cross-motions for summary judgment, the trial court declined to hold that Article I, section 20, required

---

[1] The county's actions in this case were sometimes those of the chair alone; at other times, they were those of the chair acting with the concurrence of certain other members of the Board of Commissioners. However, no legal distinction attaches to those factually different circumstances. We therefore refer throughout this opinion to "the county" as the pertinent actor.

[2] According to the pleadings, four of the same-sex couples had obtained marriage licenses from the county and had participated in marriage ceremonies. Four other couples had been denied licenses—two by Lane County officials and two by Benton County officials. The ninth couple wished to obtain a marriage license in the future.

[3] Article I, section 20, of the Oregon Constitution provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

making marriage *itself* available to same-sex couples. Instead, the trial court ruled that ORS chapter 106 violated Article I, section 20, by denying certain *benefits* to same-sex couples that otherwise were available to married opposite-sex couples by virtue of their marriages. The state appealed that judgment to the Court of Appeals, which in turn certified the appeal to this court pursuant to ORS 19.405(1).[4] We accepted the certified appeal and, for the reasons that follow, now reverse the judgment of the trial court.

The pertinent facts are undisputed. In February and March 2004, some members of the Multnomah County Board of Commissioners began discussing privately whether same-sex couples could marry under Oregon law and, if they could not, whether that disability violated the couples' constitutional rights. Those commissioners then asked the Multnomah County Counsel for her view. Counsel opined that the marriage statutes set out in ORS chapter 106 might not proscribe such marriages but that, even if they did, such a proscription would violate the rights of same-sex couples under Article I, section 20. Counsel further opined that, although no court decision had held that Article I, section 20, required that marriage be available to same-sex couples, this court's decision in *Cooper v. Eugene School Dist. No. 4J*, 301 Or 358, 364-65, 723 P2d 298 (1986), stated that governmental officials have "a duty to follow the Constitution regardless of whether a court has ruled on the constitutionality of a particular issue." Expanding on that notion, counsel advised the commissioners that the marriage statutes set out in ORS chapter 106 could not be used to bar same-sex marriages, if the commissioners were of the opinion that those statutes were unconstitutional:

"The County's duty to act in compliance with the Constitution applies even when a court has not yet found a particular statute or government action unconstitutional. Therefore, if the Oregon Constitution prohibits Multnomah

---

[4] ORS 19.405(1) provides:

"When the Court of Appeals has jurisdiction of an appeal, the court, through the Chief Judge and pursuant to appellate rules, may certify the appeal to the Supreme Court in lieu of disposition by the Court of Appeals. The Court of Appeals shall provide notice of certification to the parties to the appeal."

County from denying marriage licenses to same sex couples, the County may not rely on the marriage statute to continue to do so."

Thereafter, on March 3, 2004, the county directed the Multnomah County Records Management Division to begin issuing marriage licenses to same-sex couples.[5] As already indicated, in the weeks that followed, the county issued marriage licenses to approximately 3,000 same-sex couples, and the documents reporting the marriages performed pursuant to those licenses were forwarded to the State Registrar.

At the Governor's direction, the State Registrar refused to file or register any same-sex marriage records that were forwarded to that office. In letters sent to same-sex couples to whom the county had issued licenses, the State Registrar explained that (1) the Attorney General had concluded that Oregon's marriage statutes currently defined marriage as a union between a male and a female and, for that reason, (2) the Governor had directed state agencies not to give legal effect to marriage licenses issued to same-sex couples. The letter concluded that such licenses did not constitute marriage records as described in Oregon law. The State Registrar returned the records to the county officials who had issued them.

Plaintiffs then filed the present action in Multnomah County Circuit Court seeking declaratory and injunctive relief. Initially, plaintiffs were nine same-sex couples, the advocacy group Basic Rights Oregon, and the American Civil

---

[5] The ministerial aspects of issuing marriage licenses in Oregon have, by statute, long been a county function. For example, county clerks are charged with the responsibility of physically issuing the licenses, ORS 106.041, and collecting applicants' licensing fees, ORS 106.045. The county clerk is also the entity that must receive a couple's written application and verify that the legal requirements for issuing a marriage license have been met. ORS 106.077. County clerks, however, cannot issue marriage licenses contrary to the statutes set out in ORS chapter 106 that circumscribe their functions. ORS 106.110.

Multnomah County does not have a "county clerk." Instead, the county's charter provides that, "[f]or purposes of county services and the administration of county affairs, the board of county commissioners shall establish administrative departments." Multnomah County Home Rule Charter 6.20. In turn, the Multnomah County Code establishes the Department of Business and Community Services (of which the Records Division is a subsection) and has assigned to the Records Division the job of administering "marriage license and domestic partner registration services." MCC § 7.001(T).

Liberties Union of Oregon. The trial court later granted the county status as a plaintiff-intervenor. In addition to the original defendants—the State of Oregon and its Governor, the Attorney General, the Director of the Department of Human Services, and the State Registrar—the trial court allowed four more individuals and an organization, the Defense of Marriage Coalition (DOMC), to be added as defendant-intervenors.

In this court, the parties limit their arguments to the constitutional issue that plaintiffs raised below. However, if same-sex marriages presently may be licensed and performed as a matter of statutory law under ORS chapter 106, then the constitutional question that plaintiffs raise would be irrelevant. We therefore first address the question whether ORS chapter 106 authorizes marriages between same-sex couples.[6]

■ Our review begins with ORS 106.010, which defines marriage in Oregon. That statute provides:

"Marriage is a civil contract entered into in person by males at least 17 years of age and females at least 17 years of age, who are otherwise capable, and solemnized in accordance with ORS 106.150."

Although the phrase "entered into in person by males * * * and females" suggests that marriage in Oregon is a contract between a male and female, it is not necessarily dispositive. However, when that phrase is read in context with other statutes relating to marriage, no doubt remains. ORS 106.150(1), which is cross-referenced in ORS 106.010, requires the parties to a marriage to declare that "they take each other to be *husband and wife.*" (Emphasis added.) Similarly, under ORS 106.041(1), the authorization accompanying a properly issued marriage license requires the official conducting the marriage ceremony "to join together as *husband and wife* the persons named in the license." (Emphasis added.)

Although the legislature has not defined the terms "husband" or "wife" for the purposes of ORS chapter 106,

---

[6] At trial, the parties stipulated that ORS chapter 106 does not allow same-sex marriage. Of course, that stipulation as to the state of the applicable law is not binding on this court.

under this court's methodology for interpreting statutes, we give those words their "plain, natural and ordinary meaning." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). Here, by their respective dictionary definitions, "husband" means "a married man," and "wife" means a "married woman." *Webster's Third New Int'l Dictionary* 1104, 2614 (unabridged ed 2002). As a result, although nothing in ORS chapter 106 expressly states that marriage is limited to opposite-sex couples, the context that ORS 106.150(1) and ORS 106.041(1) provide leaves no doubt that, as a statutory matter, marriage in Oregon is so limited. The trial court thus did not err in accepting the parties' stipulation to that effect.

We return to the issues that the parties litigated at trial. Plaintiffs, whose motion for summary judgment was successful, argued that the right to marry is a "privilege" under the Oregon Constitution and that Article I, section 20, prohibits using sexual orientation or gender as a basis to deny such a privilege. In advancing that argument, plaintiffs sought four forms of relief: (1) a declaratory judgment stating that the marriage statutes set out in ORS chapter 106 were unconstitutional; (2) a declaratory judgment stating that the State Registrar's refusal to file and register the records of same-sex marriages in Oregon was unconstitutional; (3) as an alternative to the second form of relief, judicial review under Oregon's Administrative Procedures Act, ORS 183.310 to 183.690, of the final agency orders that prohibited registration; and (4) in the event that no adequate remedy existed under one or more of the first three proposed forms of relief, a writ of mandamus compelling the State Registrar to process the records of the same-sex marriages already licensed and performed in Oregon.

As noted, the trial court agreed with plaintiffs' constitutional premise. However, the court declined to grant the relief that plaintiffs sought, *viz.*, extension of the right of marriage to same-sex couples. Instead, the court fashioned a judgment that purported to extend the *benefits* of marriage to same-sex couples without altering the Oregon statutes limiting the right to marry to opposite-sex couples. The court's rationale was that the aspect of the marriage statutes that violated Article I, section 20, of the Oregon Constitution was

the resulting denial to same-sex couples of the benefits of marriage that were available to opposite-sex couples.

In fashioning a remedy for that perceived constitutional violation, the trial court drew heavily on the approach that the Vermont Supreme Court took in *Baker v. State*, 170 Vt 194, 744 A2d 864 (Vt 1999).[7] Citing *Baker*, the trial court held that it is "incumbent upon the legislature to evaluate the substantive rights afforded to married couples and to provide similar access to same-sex domestic partners." As a result, the trial court ordered the legislature to create a remedy consistent with the court's holding within 90 days of the commencement of the next regular or special legislative session, whichever convened first. With respect to plaintiffs' fourth claim for relief, which had sought a writ of mandamus compelling the State Registrar to register the previously unrecorded same-sex marriage records, the court held that ORS 432.405[8] mandated registration of marriage records as a nondiscretionary function of the State Registrar's office. It therefore ordered the Registrar to register the records of the same-sex marriages that had been performed pursuant to the Multnomah County licenses.[9]

The appeals and cross-appeals now before this court followed. In November 2004, while the appeals were pending,

---

[7] In *Baker v. State*, 170 Vt 194, 744 A2D 864 (Vt 1999), the Vermont high court unanimously held that excluding same-sex couples from the secular benefits and protections incident to marriage violated the "common benefits" clause of the Vermont Constitution. Although declining to decide whether the denial of marriage licenses operated as a *per se* denial of rights under the Vermont Constitution, the Vermont court's limited ruling nevertheless held that the same-sex plaintiffs before it were entitled to obtain the same benefits and protections that Vermont law afforded to married opposite-sex couples. To that end, the Vermont court ordered the state's marriage statutes to remain in effect for a reasonable period while its legislature enacted and implemented corrective measures. Ultimately, the new legislation took form as state civil union statutes. *See* Vt Stat Ann title 15, §§ 1201-1207; title 18, §§ 5160-5169 (2004).

[8] ORS 432.405(1) provides:

"A record of each marriage performed in this state shall be filed with the Center for Health Statistics and shall be registered if it has been completed and filed in accordance with this section and rules adopted by the State Registrar of the Center for Health Statistics."

[9] Following the trial court's direction, the State Registrar registered the challenged marriage licenses. The trial court did not address plaintiffs' second and third claims for relief, both of which also had sought processing of the challenged marriage licenses.

Oregon voters adopted Ballot Measure 36 (2004), a voter-initiated amendment to the Oregon Constitution aimed at defining marriage as a relationship between one man and one woman. That amendment, which became effective on December 2, 2004, provides:

> "It is the policy of Oregon, and its political subdivisions, that only a marriage between one man and one woman shall be valid or legally recognized as a marriage."

This court solicited supplemental briefing before hearing oral arguments in these matters, asking the parties to address the effect (if any) of that new constitutional provision on the issues raised in these appeals. In that regard, we need not examine each and every issue tendered to us by the responding parties respecting Measure 36; indeed, most are not relevant to the present proceedings. One issue, however, is pertinent, because it affects the prospective ability of five of the plaintiff same-sex couples to pursue their claims that Article I, section 20, entitles them to obtain marriage licenses on the same terms as opposite-sex couples. That issue is whether Measure 36 is an operative statement of law or whether it is only a statement of aspirational principle that requires some further action to make it enforceable. If it is the former, then the measure forecloses the five same-sex couples from obtaining the marriage licenses that they seek. If it is the latter, then the measure may not foreclose their Article I, section 20 claim. We turn to that issue.[10]

 In interpreting voter-initiated constitutional provisions, our goal is to discern the intent of the voters. *Flavorland Foods v. Washington County Assessor*, 334 Or 562, 567, 54 P3d 582 (2002). In doing so, the text of the constitutional provision itself provides the best evidence of the voters' intent. *Martin v. City of Tigard*, 335 Or 444, 451, 72 P3d 619 (2003). This court also considers the context of the provision, which includes other relevant constitutional provisions, case law from this court, and any relevant statutory

---

[10] This court ordinarily resolves issues tendered to it on a subconstitutional basis, where that is possible. *See, e.g., State v. Conger*, 319 Or 484, 490, 878 P2d 1089 (1994) (so stating). However, there is no subconstitutional answer to the prospective aspect of the claims of those five couples. We therefore are required to address that aspect of those claims under Measure 36.

framework in effect at the time that the voters adopted the provision. *Id.* If the voters' intent is clear from the text and context, then the court does not look further. If the provision's meaning remains ambiguous, however, the court will consider the history of the provision in an effort to resolve the matter. *Flavorland Foods*, 334 Or at 567.

In this case, the text of the new constitutional provision states that its substantive content is the "policy" of Oregon. The parties disagree about the legal effect of the term "policy" in the new provision: Is it an operative statement of law or just an aspirational principle that requires further action to establish an enforceable restriction?

■ In examining the text of a constitutional provision adopted by initiative or legislative referral, this court typically gives words of common usage their plain, natural, and ordinary meaning. *Coultas v. City of Sutherlin*, 318 Or 584, 588-89, 871 P2d 465 (1994). The dictionary definitions most applicable to the word "policy," as it is used in this context, are:

> "a: a definite course or method of action selected (as by a government, institution, group, or individual) from among alternatives and in the light of given conditions to guide and usually determine present and future decisions. b(1): a specific decision or set of decisions designed to carry out such a chosen course of action (2): such a specific decision or set of decisions together with the related actions designed to implement them c: a projected program consisting of desired objectives and the means to achieve them[.]"

*Webster's* at 1754. Clearly, a "policy" may be something more than a set of intentions. Giving the word its plain and ordinary meaning, a "policy" can be a concrete course of action, the law necessary to implement it, or both.

■ The foregoing definitional review is not dispositive; the wording of Measure 36 still could be hortatory. However, two other considerations demonstrate that the amendment is intended to state present law.

First, Measure 36 states that "only a marriage between one man and one woman shall be valid or legally recognized." That is a statement not only of the policy itself, but

also of particular *consequences* that are to occur as a result of that policy. Such wording is operational, not aspirational.

Second, Measure 36 lacks any wording directing the legislature to carry out the stated policy by appropriate legislation. If the measure were aspirational only, then we reasonably might expect to see such wording.

Based on the foregoing, we conclude that the use of the word "policy" in Measure 36 is intended to signal a presently enforceable tenet of Oregon constitutional law. And, with respect to the remaining text, there is no ambiguity regarding the measure's substantive effect. Today, marriage in Oregon—an institution once limited to opposite-sex couples only by statute—now is so limited by the state constitution as well. As the later-enacted (and more specific) constitutional provision, Measure 36 resolves any prospective claims that plaintiffs may have had under Article I, section 20, to obtain marriage licenses. The claims of the five same-sex couples that they are entitled as a matter of state law, now or hereafter, to obtain marriage licenses and to marry thus fail.

The parties also differ over the effect, if any, of the adoption of Measure 36 on the remaining issues in these appeals and, particularly, on the remedy that the trial court fashioned. In that regard, plaintiffs argue that, although the text of the measure prohibits same-sex marriage itself, it omits any reference to the *benefits* of marriage. Therefore, according to plaintiffs, Measure 36 does not speak to the issue whether Article I, section 20, prohibits using gender or sexual orientation as a basis for denying the benefits of marriage. Accordingly, plaintiffs urge this court to conclude that the voters did not intend to hinder this court from fashioning a remedy in these appeals that extends such benefits to same-sex couples. However, the issue of the availability of marriage *benefits* to same-sex couples is not properly before us. At trial, plaintiffs did not seek access to the benefits of marriage apart from, or as an alternative to, marriage itself. The trial court therefore improperly went beyond the pleadings in fashioning the particular remedy that it chose. We do not address that topic further.

■ Plaintiffs also raise issues concerning the effect of Measure 36 on the remaining same-sex couples, who received licenses and participated in marriage ceremonies before that measure became effective. They argue that the measure cannot be construed to affect the legal validity of those relationships because nothing in the text or context of the measure indicates an intent to either (1) retroactively invalidate the challenged marriage contracts; or (2) prospectively invalidate those contracts from the effective date of Measure 36.[11] That argument assumes that those marriages were legally valid before the adoption of Measure 36. However, we disagree with that premise. As we explain below, the county did not have authority to issue the licenses for the marriages in question.

■ This court decides cases on subconstitutional grounds when it can, even if the parties present only constitutional arguments for the court's consideration. *See, e.g., State v. Conger,* 319 Or 484, 490, 878 P2d 1089 (1994); *Zockert v. Fanning,* 310 Or 514, 520, 800 P2d 773 (1990) (so stating). Here, the spark that ignited this controversy was the county's decision to issue marriage licenses to otherwise-qualified same-sex couples. DOMC argued below—and continues to argue on appeal—that, as a matter of law, the county lacked legal authority to make that decision. If DOMC's position is correct, then the marriage licenses at issue here were void *ab initio,* and this case is at an end. We turn now to that inquiry.

Early in Oregon's statehood, this court recognized in *Rugh v. Ottenheimer,* 6 Or 231 (1877), that, even at common law, the state had an interest in marriage contracts and was entitled to exercise legislative control over them. *Id.* at 236. Extending that notion into the civil law context, the court in *Rugh* concluded:

> "The marriage relation, affecting the whole public, and being an institution of society, affecting more deeply than any other the foundations of social order and public morals, *has always been under the control of the legislature.*"

---

[11] The county also argues that ORS chapter 106 violates the Fourteenth Amendment to the United States Constitution. That issue, however, was not raised before the trial court and therefore is unpreserved. We do not consider it.

*Id.* at 237 (emphasis added).

Subsequent decisions by this court further acknowledged the sovereignty of the state—and, by extension, state law—in matters involving marriage. For example, in *Heisler v. Heisler*, 152 Or 691, 55 P2d 727 (1936), the court wrote:

> "In the state of Oregon, 'marriage' is a civil contract entered into *with the consent of the state*, between a man and woman, competent to so contract, in the presence of two witnesses, solemnized by some one authorized by statute (Code 1930, § 33-104) for that purpose."

*Id.* at 693 (emphasis added). Still later, in *Dakin v. Dakin*, 197 Or 69, 72, 251 P2d 462 (1952), the court categorized the marital relationship as "one in which the state is deeply concerned and over which it exercises a jealous dominion."

Finally, the court underscored the scope of that dominion in *Garrett v. Chapman*, 252 Or 361, 449 P2d 856 (1969). There, the court acknowledged the rule that marriages deemed valid in the states where they are performed generally will be recognized in Oregon as well. When it did so, however, the court also expressly allowed for "exceptions to the general rule *where the policy of this state* dictates a different result than would be reached by the state where the marriage was performed." *Id.* at 364 (emphasis added).

The foregoing cases demonstrate that the state and, more specifically, the legislature, is the locus of power over marriage-related matters in Oregon. If that power is broad enough to preempt other states' contrary marriage policies, it inescapably is broad enough to preempt similar policies generated by a political subdivision of this state, such as the county. It is true that nothing in ORS chapter 106 expressly reserves exclusive authority over marriage to the state; however, we cannot ignore this court's jurisprudence that expressly recognizes that exclusive authority, absent some clear legislative directive to the contrary. We conclude that Oregon law currently places the regulation of marriage exclusively within the province of the state's legislative power.

The county, however, contends that it lawfully exercised *state* authority when it directed county employees to

issue marriage licenses to same-sex couples. Specifically, the county points out that the constitutional home rule provision for counties, Article VI, section 10, of the Oregon Constitution, requires county officials to perform all the duties delegated to their counties under the state constitution. Those duties, the county argues, include the requirement contained in Article XV, section 3, of the Oregon Constitution to take an oath or affirmation to support the state and federal constitutions.[12] The county then asserts that, under this court's decision in *Cooper*, 301 Or 358, the county was fulfilling the duty of its commissioners to uphold the constitution when it directed county employees to begin issuing marriage licenses to same-sex couples. The county, however, reads too much into too small a part of *Cooper*.

*Cooper* involved judicial review of an administrative decision of the Eugene School District (the district). The district had suspended a teacher who had persisted in wearing religious dress while teaching, in contravention of state statute. After a hearing, the State Superintendent of Public Instruction (the superintendent) revoked the teacher's teaching certificate. The teacher subsequently challenged the superintendent's revocation order on constitutional grounds, and the Court of Appeals set aside the order based on federal First Amendment jurisprudence. 301 Or at 360. Thus, the case was, as this court noted from the outset of its opinion, an ordinary one of judicial review of an administrative order in a contested case. *Id.* at 361.

The court's repeated references in *Cooper* to the nature of the case before it provide context for the part of the court's opinion on which plaintiffs rely:

"What the parties wanted the Superintendent to decide was the constitutional validity of the law forbidding a teacher to wear religious dress while on duty. The Superintendent,

---

[12] Article XV, section 3, of the Oregon Constitution provides:

"Every person elected or appointed to any office under this Constitution, shall, before entering on the duties thereof, take an oath or affirmation to support the Constitution of the United States, and of this State, and also an oath of office."

adopting the hearing officer's memorandum of law, concluded that he had no power to decide the constitutional question. * * *

"Enough judicial opinions have said that agencies cannot pass on the constitutionality of laws entrusted to them to support the cautious conclusion of the hearing officer's memorandum, at least as to federal agencies; but more recently the proposition has been questioned. It deserves examination."

*Id.* at 362-63 (footnote omitted). Stated differently, the crux of the issue in *Cooper* was whether the superintendent—as an administrative adjudicator—had authority to rule on a constitutional question, in the context in which the question arose in that case.

In considering that issue, the court noted that, in the main, treatise writers tended to place discussion of administrative agencies' supposed lack of authority to pass on constitutional questions within their broader discussions of the doctrine of exhaustion of administrative remedies. By that theory, the failure of a party to present a constitutional theory to an administrative agency, but to later assert such a theory to a reviewing court, did not violate the exhaustion principle. *See id.* (citing 3 Davis, *Administrative Law Treatise* 74, § 20.04 (1958); Jaffe, *Judicial Control of Administrative Action* 438 (1965)). The court in *Cooper* distinguished that analysis, however:

"This is not such a case. Opinions denying agency power in constitutional cases only as an explanation for dispensing with the normal exhaustion requirement are weak authority for a holding that an agency should not consider a constitutional claim when a party chooses to exhaust that process [before the agency, rather than waiting for judicial review], or that the agency errs if it does decide the issue. * * *.

"*Long familiarity with the institution of judicial review sometimes leads to the misconception that constitutional law is exclusively a matter for the courts. To the contrary, when a court sets aside government action on constitutional grounds, it necessarily holds that legislators or officials attentive to a proper understanding of the constitution would or should have acted differently.* Doubt of an agency's

obligation to decide constitutional challenges to its govern-
ing statute is itself a question of interpreting the agency's
statutory duties. *The agency's duty to decide such chal-
lenges would not be doubted if the legislature provided for it
expressly rather than doing so implicitly under the general
term 'law' in the Administrative Procedure Act provisions
that require a final order in a contested case to include the
agency's conclusions of law, ORS 183.470(2), and subject the
order to reversal if it violates a constitutional provision,
ORS 183.482(8)(b)(C) * * *.*"

*Id.* at 364-65 (footnote omitted; emphasis added).

The footnote omitted from the foregoing material
quotes Article IV, section 31(g), and Article XV, section 3, of
the Oregon Constitution, which require state legislators and
other elected officials to swear, before taking office, that they
will uphold the state and federal constitutions. The footnote
goes on to state:

"As these provisions show, the constitution does not con-
template that legislators and officials will act as they think
best and leave the constitutionality of their acts to the
courts. * * * The Superintendent of Public Instruction him-
self holds a constitutional office, Or Const, Art VIII, § 1, and
must satisfy himself that he conducts it in accordance with
the constitution."

Plaintiffs rely on that footnote to justify the county's
actions in this case. As the full context of the footnote makes
clear, however, the court in *Cooper* did not view the consti-
tutional duty to take the oath as creating a general license for
any governmental official to go forth and remedy any consti-
tutional wrong that the official perceived. Instead, the court
made its statement concerning an official's independent duty
to consider the constitution in the context of an agency offi-
cial *deciding a contested case*, a circumstance in which the
particular official (there, the superintendent) specifically was
authorized by statute to exercise quasi-judicial authority to
resolve a legal dispute between the parties before him.
Clearly, the official's authority to conduct and decide the con-
tested case was pivotal. That is why the court, instead of set-
ting out a general pronouncement concerning "legislators
and officials," returned at the end of the footnote in question

to focus specifically on the official whose contested case decision was before the court.

■ Properly understood, then, the footnote in question from *Cooper* (and, indeed, the entire opinion in that case) stands for the proposition that a governmental official must, within the scope of that official's otherwise lawfully delegated authority, take care to consider the meaning of the state and federal constitutions when executing official duties. But when *Cooper* is read properly, it contains no hint that the duty to be mindful of the state and federal constitutions somehow grants to a governmental official powers not otherwise devolved by law on that official to take actions and fashion remedies that, under any other circumstances, would constitute *ultra vires* acts. In reaching a contrary conclusion in the appeals before us here, the county erroneously transmogrified a governmental official's ongoing obligation to support the constitution into an implied grant of authority, respecting any laws that the official must administer, to prescribe remedies for any perceived constitutional shortcomings in such laws *without regard to the scope of the official's statutory authority to act*.

These appeals illustrate the distinction. County officials were entitled to have their doubts about the constitutionality of limiting marriage to opposite-sex couples. But, marriage and the laws governing it are matters of statewide, not local, concern. Thus, the *remedy* for such a perceived constitutional problem would be either to amend the statutes to meet constitutional requirements or to direct some other remedy *on a statewide basis*. Obviously, any such remedy must originate from a source with the authority to speak on that basis. The legislature has such authority and, in an appropriate adversary proceeding, the courts have it as well. But there is no source of law from which the county could claim such authority. To the contrary, the county's involvement in the license-issuing process is ministerial only.

These appeals do not require us to explore the full range of actions from which a governmental official might choose in vindicating that official's personal constitutional vision. *Cooper* illustrates one such way that that might occur, if the official has quasi-judicial authority. Another available

choice, when an official is vested with discretion, is to choose *not* to act, such as when a prosecutor chooses not to prosecute a case under a statute of questionable constitutional validity. Yet a third choice, when an official has no discretion, might be to decline to perform a statutory duty and leave it to a party aggrieved by that action to seek a contested case decision or judicial intervention through mandamus or declaratory judgment proceedings. But none of those alternatives is analogous to what the county did here.

Our point is vividly illustrated by comparing this case to that of *Hewitt v. SAIF*, 294 Or 33, 653 P2d 970 (1982), a case relied on by the county as an example of remedy-shaping that this court should emulate here. *Hewitt* was a case in which this court, exercising constitutionally delegated judicial authority, was asked to determine whether the denial of rights to certain workers' compensation benefits based on the gender of the prospective recipient was unconstitutional. The court held that it was. *Id.* at 50. Turning to the question of fashioning a remedy—the authority for which indisputably lies with the judiciary in cases properly before it—the court carefully considered whether to make the remedy affirmative, *i.e.*, to order that the benefits in question be made available to the improperly excluded class, given the legislature's obvious stake in the workings of the workers' compensation system. *Id.* at 50-52. The court ultimately chose the affirmative remedy of extending the benefits in question to the deprived class only when it satisfied itself that to do otherwise would thwart the overall legislative purpose behind the underinclusive statute. *Id.* at 53.

The key to the court's choice of remedy in *Hewitt* was the fact that the court *had the constitutional authority to fashion such a remedy*. There is no basis for assuming, as the county does, that the court would have purported to fashion *any* remedy, much less the one that it chose, had it not had that authority. In the present appeals, by contrast, the county had no such authority and, because it did not, it could not permissibly fashion the affirmative remedy that it decreed. It follows that the marriage licenses that the county issued to same-sex couples were issued without authority and, as such, were void *ab initio*. The trial court erred in not so holding.

In summary, we conclude as follows. First, since the effective date of Measure 36, marriage in Oregon has been limited under the Oregon Constitution to opposite-sex couples. Second, Oregon statutory law in existence before the effective date of Measure 36 also limited, and continues to limit, the right to obtain marriage licenses to opposite-sex couples. Third, marriage licenses issued to same-sex couples in Multnomah County before that date were issued without authority and were void at the time that they were issued, and we therefore need not consider the independent effect, if any, of Measure 36 on those marriage licenses. In short, none of plaintiffs' claims properly before the court is well taken. Finally, the abstract question whether ORS chapter 106 confers marriage benefits in violation of Article I, section 20, of the Oregon Constitution is not properly before the court.

The judgment of the circuit court is reversed, and the case is remanded to the circuit court with instructions to dismiss the action.